**Jason HUBBELL, Appellant**
**(Defendant Below),**

v.

**STATE of Indiana, Appellee**
**(Plaintiff Below).**

No. 03S00–9912–CR–714.

Supreme Court of Indiana.

Sept. 5, 2001.

Sean G. Thomasson, Roderick D. McGillivray, Columbus, IN, Attorneys for Appellant.

Karen M. Freeman–Wilson, Attorney General of Indiana, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

BOEHM, Justice.

Jason Hubbell was convicted of murder and criminal confinement and sentenced to seventy-five years imprisonment. In this direct appeal, he raises ten issues, which we restate as eight. Hubbell contends: (1) the trial court erred by not dismissing the grand jury's indictment; (2) evidence of the location of the victim's body and cellular phone calls violated the alibi statute; (3) the trial court abused its discretion in admitting physical and testimonial evidence; (4) the admissions of his post-polygraph statements violated his right to cross-examine witnesses; (5) the trial court abused its discretion in admitting a witness' pretrial and trial identification of Hubbell; (6) the State committed several *Brady* violations; (7) he was denied his right to counsel by frequent moves throughout the Department of Corrections; and (8) he was entitled to a new trial based on cumulative error. We affirm the judgment of the trial court.

**Factual and Procedural Background**

Sharon Myers left for work at the Arvin plant early on the morning of May 13, 1997. She never arrived. Another employee of Arvin, Sherry Young, saw a man and a woman leaving the Arvin plant as she arrived at work that same morning. The woman looked similar to Myers. The man had one hand on the woman's neck or back, and the two entered a white van and drove away.

The police came to the plant later that morning to look for Myers. Young had "mentally" made note of the license plate number and gave the police the number and a description of the van. The police traced the license plate number to a white van owned by Hubbell. Hubbell worked at the Arvin plant with Myers and had called in sick on May 13. Young then identified a picture of the van as the one she had seen that morning, and later that day identified Hubbell when police presented him to her.

In November 1997, skeletal remains were found in a marsh area in Johnson County and identified as Myers' through dental records. An autopsy showed a fracture in the hyoid bone [1] which, together with the size of a ligature found around Myers' neck, indicated that the cause of death was manual strangulation. Acrylic fibers found near the body were consistent with fibers found in Hubbell's van. Grass fragments found in the search of the van were consistent with grass samples from the marsh. The FBI obtained fingerprints from the van and also shot several rolls of film of fingerprints that might or might not be different from the fingerprints tak-

---

1. The hyoid bone is "a bone or complex of bones situated at the base of the tongue and supporting the tongue and its muscles." *Merriam Webster's Collegiate Dictionary* 569 (10th ed.1993).

en. No prints from Myers were identified, and the authorities lost the rolls of film.

On August 31, 1998, Hubbell was indicted by a grand jury on the charges of murder and criminal confinement. On September 28, Hubbell filed a notice of alibi, which he amended on October 15. The State did not respond. At trial, the State introduced parts of Hubbell's statements made following a polygraph examination. The State also introduced testimony from a jail inmate that Hubbell admitted the killing to him. Hubbell was convicted of both charges after a four-week jury trial in October and November of 1999. The trial court sentenced him to sixty-five years for murder and ten years for confinement, to be served consecutively.

## I. Grand Jury Indictment

[1] Hubbell first argues that, because there were police officers present during the grand jury proceedings, he was prejudiced and the indictments should be dismissed. Before trial, Hubbell moved to dismiss the grand jury indictment. The trial court denied Hubbell's motion after a hearing on the matter.

■ Indiana Code section 35–34–2–4 prescribes the conduct of grand jury proceedings and allows for a limited number of people, including witnesses, clerks, and the prosecuting attorney's staff, to be present during the proceedings. In Indiana, there is no per se rule presuming prejudice when unauthorized persons appear before the grand jury, or even when those persons participate in the interrogation of witnesses. *Fair v. State*, 266 Ind. 380, 390, 364 N.E.2d 1007, 1012 (1977). To obtain dismissal of an indictment, the defendant must show that his substantial rights were prejudiced. In this case, Hubbell contends that there were two police officers present during the grand jury proceedings. The first, Detective Ken Hardwick, was present during the testimony of Hubbell's wife, Robyn Hubbell. Hubbell claims that Hardwick made gestures indicating that Robyn was being untruthful and consulted with the prosecuting attorney during Robyn's testimony. Hubbell also claims that another detective, Mark Gorbett, acted similarly when Hubbell's alibi witness, Heather Hilliard, testified. Finally, he contends that two other witnesses before the grand jury were harassed.

At the hearing on the motion to quash the indictment, the State submitted an affidavit from Gorbett claiming that although officers were present, none of them took any actions indicating untruthfulness by the witnesses. Robyn testified that although her demeanor was affected by the police officers, the content of her testimony remained the same. The trial court then ruled:

> At this time as it relates to the Motion to Quash or Motion to Dismiss the Grand Jury Indictment, I'm going to find that the defendant has not proven by a preponderance of the evidence that his substantial rights have been prejudiced and I'm going to deny the Motion to Quash.

It is for the trial court to evaluate the truthfulness of the witnesses. We cannot conclude on this record that the finding of absence of prejudice was error.

## II. Alibi Statute

■ The indictment in this case stated that Hubbell was in Bartholomew County on May 13, 1997. Hubbell contends that the trial court erred by admitting evidence of Myers' body, which was found in Johnson county, and cellular phone calls that were made from outside Bartholomew County. The basis of this contention is his notice of alibi defense claiming he was in Bartholomew County on those dates. The State did not respond

to the notice. Under the alibi statute, Indiana Code section 35–36–4–3, if the State does not respond to a notice of alibi defense, the court is to exclude "evidence offered by the prosecuting attorney to show that the defendant was at a place other than the place stated in ... the indictment." This Court has refused to adopt a rule excluding all evidence of events occurring outside the time and spatial limits raised by a notice of alibi defense. *Woods v. State,* 250 Ind. 132, 143, 235 N.E.2d 479, 485 (1968). Testimony describing events outside these limits is admissible if it circumstantially proves commission of a particular crime within the limits. *Id.* Evidence of Myers' body was not used to prove that Hubbell committed a crime in Johnson County, for example, body dumping. *See* Ind.Code §§ 23–14–54–1 to 2, 23–14–54–5 (1998). Rather, it was offered as circumstantial evidence supporting the claim that he committed crimes in Bartholomew County.[2]

Similarly, the cellular phone calls were not offered to establish that Hubbell was outside of Bartholomew County. At trial, David Ebney, a former operations manager for Blue Ridge Cellular, testified that the signal of the Indianapolis cellular phone tower overlapped into Bartholomew County. The trial court also admitted Hubbell's cellular phone bill, which showed that he made two phone calls on May 13, 1997 through a cellular tower located north of Bartholomew County. However, there was no testimony that calls from the cellular tower outside of Bartholomew County must have been made outside of Bartholomew County. The jury was left with unconnected and incomplete testimony on that point. In short, the evidence of the location of the body and calls was not used to prove that the "defendant was at a place other than the place stated in the indictment." Accordingly, the trial court did not err in admitting this evidence.

### III. Evidentiary Issues

Hubbell contends that there were two evidentiary errors in his case that require reversal because the resulting prejudice outweighed any probative value. Relevant evidence is admissible unless its probative value is substantially outweighed by the danger of unfair prejudice. Ind. Evidence Rule 403. The trial court's rulings on the admission of evidence under Rule 403 are reviewed for an abuse of discretion.

### A. *Hubbell's Gun and Ammunition*

■ Hubbell contends that the admission of a handgun found in his home and bullets found in his van violated Indiana Evidence Rule 403. The State argues that because the gun matched bullets found in the van, the jury could have concluded that the gun was used to coerce Myers into the van. Hubbell filed a pretrial motion in limine to exclude this evidence arguing that there was no evidence that a gun was used to commit this crime. The State argued that Myers left her work "against her will," presuming that a gun was used to coerce her. The trial court denied the motion.

■ We agree with Hubbell that the introduction of the gun and bullets was an abuse of discretion. The State presented no evidence that Myers was coerced with a gun to leave her place of employment and no evidence that the gun was in any way connected with her murder. Its suggestion that Hubbell may have used the gun to coerce Myers is no more than speculation given the absence of any other evidence suggesting the use of a weapon.

---

**2.** The same is true of evidence of grass fragments found on the underside of Hubbell's van.

There also was a danger of unfair prejudice from admission of the gun. "As a general proposition, we agree that the introduction of weapons not used in the commission of the crime and not otherwise relevant to the case may have a prejudicial effect." *Lycan v. State*, 671 N.E.2d 447, 454 (Ind.Ct.App.1996).

The highly attenuated relevance of the gun was insufficient to overcome its potential prejudice. However, any error in the admission of the gun and bullets was harmless. "Errors in the admission or exclusion of evidence are to be disregarded as harmless error unless they affect the substantial rights of a party." *Fleener v. State*, 656 N.E.2d 1140, 1141 (Ind.1995); Ind. Trial Rule 61. In this case, the State presented evidence that a man matching Hubbell's description and driving Hubbell's van left the Arvin parking lot with a woman who looked like Myers. Fibers and grass near Myers' body matched fibers and grass from Hubbell's van. Finally, Hubbell confessed to a jail inmate that he murdered Myers. Given this evidence, we cannot say that evidence of the gun and bullets affected Hubbell's substantial rights.

### B. *Fingerprint Film*

Hubbell also contends that the trial court abused its discretion in admitting testimony that two rolls of film containing photographs of fingerprints found in Hubbell's van were destroyed. The FBI conducted a search of Hubbell's van on May 19, 1997. They found numerous fingerprints, but none from Myers. The FBI also took pictures of other fingerprints from the van. These rolls of film were lost before they could be developed. Hubbell filed a motion in limine to exclude testimony of the lost rolls of film because of the danger that the jury would assume the missing film contained fingerprints of the victim. The trial court denied this

motion and, at trial, an FBI agent testified that, although the film had been destroyed, more fingerprints were found in the van.

We think admitting the testimony was error. Unless there was some basis to suggest the missing fingerprints were Myers', this testimony again raises only speculation. There was no evidence suggesting that the lost photographs were of fingerprints from a source different from the fingerprints that were not lost. The lost photos do not suggest that anyone else, much less Myers, was in the van. Although the probative value of this testimony is minimal, its prejudicial effect was also low and any error was harmless for the same reason as the gun and bullets.

### IV. Hubbell's Post–Polygraph Statements

Hubbell also contests the admission of his statements from a post-polygraph interview. On May 19, 1997, Hubbell submitted to a polygraph examination. Sergeant Jeff Williams questioned Hubbell after the interview. The exact questions are not in the record because Williams' notes have been destroyed. However, in his report, Williams stated:

During the post-test interview I explained the results of the polygraph examination to [Hubbell] to see if he could furnish any reason for the deceptive responses. When I stated to him that I believed that he was responsible for [Myers'] disappearance he stated that it might be possible but he can't say that he did it. He stated that he has prayed to God every night since then that it isn't so. When I asked him to explain further he states he knows that he does things during his episodes that he can't remember so he always has doubts now about things he could have done.

Hubbell filed a motion in limine to exclude any evidence of this exchange. The motion was denied and Williams testified to the statements Hubbell made, with no ref-

erence to the polygraph examination. Hubbell argues that the trial court erred in admitting this testimony because he was unable to cross-examine Williams fully because evidence of the polygraph was inadmissible. He urges this Court to "render inadmissible any [post-polygraph] statements which are not admissions, but are speculative responses to an officer's question of why the polygraph indicated deceptive responses."

[12] As an initial matter, Hubbell cites to no authority for this proposition. Although the right to cross-examine witnesses is guaranteed by the Sixth Amendment to the United States Constitution and Article I, Section 13 of the Indiana Constitution and is "one of the fundamental rights of our criminal justice system," *Pigg v. State,* 603 N.E.2d 154, 155 (Ind. 1992), it "is subject to reasonable limitations placed at the discretion of the trial judge." *McQuay v. State,* 566 N.E.2d 542, 543 (Ind.1991); *accord Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). Requiring Hubbell to choose between incomplete questioning (foregoing his Sixth Amendment rights) and revealing unfavorable polygraph results would present an impermissible choice. But Hubbell gives no reason why a complete cross-examination of Williams required reference to the polygraph. The trial court stated:

> With regard to Motion in Limine #6 concerning the defendant's post polygraph statements to Detective Williams; these statements are not tied so directly to the polygraph results that they force the defendant to "invoke the doctrine of completeness" and divulge the fact that a polygraph examination was performed. In the police report, Officer Williams says: "When I stated to him that I believed that he was responsible for Sharon's disappearance he stated that it might be possible but he can't say that he did it." This portion of the conversation is illustrative of the post polygraph questioning. The discussion does not require the divulgence of the polygraph exam.

Based on this record, we conclude that the trial court was correct that exploring the polygraph examination was not critical to Hubbell's statements or his ability to cross-examine Williams.

## V. Eyewitness Identification

[13] Hubbell next contends that the trial court erred in admitting Young's pre-trial and in-court identifications. He contends that the pre-trial identification was unduly suggestive and therefore tainted the in-court identification. He further contends that the suggestive lineup led Young to add further details to her description of Hubbell. On the morning of Myers' disappearance, Young saw a man and a woman get into a white van in her employer's parking lot and drive away. Young was able to give the police the license plate number of the van, and described the man as having "blonde hair, probably five nine, six foot." Less than six hours later, police presented Hubbell to Young in a showup or single person lineup. At the showup, Young thought Hubbell was the man she had seen driving the van, although she was not positive. This testimony was corroborated by Steve Prosser, another witness at the showup. Two police officers testified that Young was not positive that Hubbell was the man driving the van.

At trial, Young testified that she watched the couple walk across the parking lot for several minutes and took notice of them because they were leaving work at an unusual hour. She also testified that she was approximately thirty feet from the van and had a three-quarters view of the driver's face for three seconds. The parking lot was well-lit and the driver of the van turned and made eye contact with Young before driving away. She made a

mental note of the license plate number of the van. Her description of the suspect remained largely the same after the show-up, although she did provide more detail on his haircut.

In *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), *overruled on other grounds by Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), the United States Supreme Court noted that a show-up procedure may be so unnecessarily suggestive and so conducive to irreparable mistake as to constitute a violation of due process. Such a claimed violation is to be examined in light of the totality of the circumstances surrounding it. *Id.* A per se rule of exclusion of pre-trial identification evidence involving suggestive or unnecessary procedures was rejected in *Manson v. Brathwaite*, 432 U.S. 98, 109–14, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). Instead, due process permits the admission of such evidence if, under the totality of circumstances, the identification is reliable. *Accord Neil v. Biggers*, 409 U.S. 188, 196–201, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Hubbell's claim thus involves a two-step analysis. *Slaton v. State*, 510 N.E.2d 1343, 1348 (Ind.1987). The first question is whether the initial identification procedure was unnecessarily or impermissibly suggestive. *Id.* As noted in *Stovall*, "The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." 388 U.S. at 302, 87 S.Ct. 1967. This Court has also recognized the inherent suggestiveness of such one-on-one confrontations. *Head v. State*, 443 N.E.2d 44, 55 (Ind.1982); *Poindexter v. State*, 268 Ind. 167, 173, 374 N.E.2d 509, 512 (1978). The second inquiry is whether, under the totality of the circumstances, the identification was reliable even though the procedure was suggestive. *Slaton*, 510 N.E.2d at 1349. We have permitted such procedures when they occur shortly after the commission of the crime "because of the value of permitting a witness to view a suspect while the image of the perpetrator is fresh in the witness's mind." *Head*, 443 N.E.2d at 55. "Likewise, one-on-one confrontations have been found proper where circumstances rendered an alternative approach such as a lineup impossible." *Id.* at 55–56.

In this case, we agree with Hubbell that the "single person lineup" was unduly suggestive. We also find no exigent circumstances requiring this showup, which occurred six hours after Young had seen the white van leaving the parking lot. *Wethington v. State*, 560 N.E.2d 496, 502 (Ind.1990) (showup two hours after robbery was unduly suggestive). Thus, the pre-trial identification was erroneously admitted.

Where it is established that evidence of an out-of-court identification has been erroneously admitted based on a finding that the confrontation procedure was impermissibly suggestive and not otherwise justified based on the totality of the circumstances, the error may nonetheless be harmless. A conviction will not be reversed if the State can show beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), *cited in Wethington*, 560 N.E.2d at 502. Whether or not Young could identify Hubbell conclusively, she did identify his van by license plate number and also reported a driver of his general description. This, together with the fiber and grass matches and Hubbell's confession, renders any error in Young's identification harmless.[3]

---

3. For the same reasons, any error in admitting Young's in-court identification of Hubbell

## VI.  *Brady* Violations

Hubbell claims that his due process rights were violated by the State's failure to disclose exculpatory evidence and the trial court's failure to perform an in camera review of all the evidence to look for additional exculpatory evidence.[4]

### A.  *Conservation Report*

■ First, Hubbell contends that the State failed to produce a complete case report by a conservation officer. The State produced a two-page case report in response to Hubbell's motion to produce. However, Hubbell later learned of the existence of a fifteen-page report that contained an interview with a witness claiming to see suspicious persons in the area where the body was found. Hubbell had copies of this report at least ten months prior to trial.

■ Although not explicitly stated, it appears that Hubbell is contending that the State's actions violated *Brady v. Maryland*, 373 U.S. 83, 86–88, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. There is no doubt that the State is required to disclose evidence that is favorable to the accused and material to the accused's guilt or punishment. *See Williams v. State*, 714 N.E.2d 644, 648–49 (Ind.1999), *cert. denied*, 528 U.S. 1170, 120 S.Ct. 1195, 145 L.Ed.2d 1099 (2000). Evidence favorable to the accused includes impeaching evidence. *Id.* at 649. In this case, however, the full conservation report was discovered at least ten months prior to the actual trial. Hubbell had adequate opportunity to investigate the witness and alter trial strategy accordingly. *Brady* applies to the discovery of favorable evidence "after trial." *See Lowrimore v. State*, 728 N.E.2d 860, 866–67 (Ind.2000); *Williams*, 714 N.E.2d at 648–49; *accord Dye v. State*, 717 N.E.2d 5, 12 (Ind.1999), *cert. denied*, 531 U.S. 957, 121 S.Ct. 379, 148 L.Ed.2d 292 (2000)

### B.  *Marcus Yano*

■ Hubbell also contends that he was denied the opportunity to discover a report detailing the exculpatory testimony of Marcus Yano. At trial, a witness testified that Eddie Harrison, Hubbell's candidate as the perpetrator of these crimes, had told her he killed Myers. Harrison denied making the statement. Hubbell requested the entire police file on Myers' murder prior to his deposition of Detective Dennis Knulf. Knulf appeared at his deposition with a summary report, which the State refused to turn over to Hubbell. After trial, Yano came to defense counsel's office and signed an affidavit claiming that Harrison was in the Arvin parking lot the morning Myers disappeared and that Knulf knew of this. Hubbell now claims that the summary report contained information leading to Yano and that he was denied the opportunity to discover this fact.

Hubbell learned of Yano's allegations on November 5, 1999, after the guilty verdict, but before the sentencing hearing on December 3. He did not raise this issue until

---

was also harmless.

4.  In his reply brief, Hubbell claims he was "denied his Due Process Rights based upon a pattern of conduct on the part of the State and its agents that deprived Defendant of his ability to effectively discover relevant and/or exculpatory evidence the State had in either its actual or constructive possession." *Brady* violations are a species of due process violations and as such are addressed above. To the extent Hubbell is making a separate claim, he argues that the trial court erred by not reviewing all the evidence in camera to determine whether Hubbell had access to all exculpatory, material evidence. We find no authority requiring trial courts to perform such an extensive task and are not inclined to order them to do so.

January 19, 2000, when he filed an affidavit unaccompanied by any motion. Although Indiana law has not been entirely clear on this point, the procedural steps for raising a *Brady* issue are controlled by Criminal Rule 16 and Trial Rules 59 and 61. A *Brady* violation is almost always based on evidence that comes to light after trial. If so, it is raised by a motion for a new trial based on newly discovered evidence, or a motion to correct error. Pursuant to Criminal Rule 16(A), the defendant must file a motion to correct error in order to address "newly discovered material evidence, including alleged jury misconduct, capable of production within thirty (30) days of final judgment which, with reasonable diligence, could not have been discovered and produced at trial." *See also* Ind. Trial Rule 59(A). A motion to correct error addressing newly discovered evidence "is a mandatory prerequisite for an appeal, and a failure to file such a motion will result in a waiver of the issue" unless the provisions of Trial Rule 60(B)(2) for late discovered evidence apply.[5] 4A Kenneth M. Stroud, *Indiana Practice* § 4.1, at 44 (2d ed.1990). Because Hubbell knew of Yano's affidavit within thirty days after the judgment and failed to file a motion to correct error, Hubbell has waived this issue.

Requiring a defendant to file a motion to correct error gives the trial court an opportunity to rule on the issue and may avoid an unnecessary appeal. Hubbell's attempt to raise the issue on appeal without trial court review, and without a hearing in the trial court, puts the appellate court in the unenviable position of attempting to weigh credibility on an undeveloped paper record. This is a task for the trial court. The trial judge has the benefit of a detailed understanding of the other evidence in the case and can best assess any potential prejudice as well as weigh the credibility of claims of new evidence. For all these reasons, the issue is not preserved on this record.

## VII. Improper Transfers in Department of Corrections

Hubbell claims that he was denied both his right to be present at important stages of the criminal proceedings and his right to counsel as a result of his frequent transfers by the Department of Corrections.[6] On December 9, 1998, Hubbell was transferred, over his objection, to the Department of Corrections because its medical facilities were better than those in the Bartholomew County Jail. On August 11, 1999, Hubbell was transferred back to the jail pursuant to his request. In the interim, Hubbell had spent time at the Plainfield, Pendleton, and Michigan City correctional facilities. He claims these frequent moves made it impossible for him to attend several court proceedings and impossible for his attorney to contact him and discuss important decisions.

Although Hubbell has the right to be present at significant stages of the criminal proceedings, he has not established that any hearings he missed, including the one on July 14, 1999, were of critical importance to implicate the Con-

---

**5.** Trial Rule 60(B)(2) allows a party to file a motion for relief from judgment within one year after the judgment for "newly discovered evidence, which by due diligence could not have been discovered in time to move for a motion to correct errors under Rule 59."

**6.** Hubbell also contends that Indiana Code sections 35–33–11–1 and 2 were violated, thus

violating his due process rights. He has not alleged any specific harm from a violation of these statutes, nor has he presented this Court with any authority as to why a violation of these statutes should be cause to vacate these convictions. *See Parr v. State*, 504 N.E.2d 1014, 1018 (Ind.1987).

frontation Clause. Even if the Confrontation Clause is not violated, the right to be present may be guaranteed by the Due Process Clause of the Fourteenth Amendment, which guarantees the defendant the right to be present in his own person "whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge.... [T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *United States v. Gagnon,* 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) (quoting *Snyder v. Massachusetts,* 291 U.S. 97, 105–06, 107–08, 54 S.Ct. 330, 78 L.Ed. 674 (1934)). In sum, "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer,* 482 U.S. 730, 745, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987).

■■■ The defendant has the burden of showing how his presence could contribute to a more reliable determination of the fact at issue. If a defendant can contribute or gain nothing from attending the proceeding, then his due process right is not violated. *Id.; see also Hovey v. Calderon,* 1996 WL 400979, at *10 (N.D.Cal. July 10, 1996). Hubbell has not shown, or attempted to show, how any of these proceedings were critical to the outcome of the trial or how his presence would have contributed to the fairness of the procedure. *Stincer,* 482 U.S. at 745, 107 S.Ct. 2658. Accordingly, his due process claim fails. *Ridley v. State,* 690 N.E.2d 177, 180–81 (Ind. 1997).

As for the right to counsel, there is no showing that the transfers were made for the purpose of preventing Hubbell from conferring with counsel, or from preparing his defense. Nor is there any showing, other than Hubbell's general allegations, that the transfers had this effect. There is therefore no reversible error on this issue. *See Nagy v. State,* 505 N.E.2d 434, 436 (Ind.1987); *Hurley v. State,* 446 N.E.2d 1326, 1331 (Ind.1983).

## VIII. Cumulative Error

As a final point, Hubbell suggests that even if each of the foregoing individual errors was harmless, their cumulative effect requires reversal. The State responds that a number of trial irregularities that do not amount to error standing alone do not collectively amount to reversible error. *See Reaves v. State,* 586 N.E.2d 847, 858 (Ind.1992); *Stonebraker v. State,* 505 N.E.2d 55, 61 (Ind.1987). Assuming, for the sake of argument, that under some circumstances the cumulative effect of trial errors may warrant reversal even if each might be deemed harmless in isolation, in this case it is clear in light of the evidence of guilt that no prejudice resulted from any of the erroneous rulings, individually or cumulatively. *Thompson v. State,* 728 N.E.2d 155, 163 (Ind.2000).

## Conclusion

The judgment of the trial court is affirmed.

SHEPARD, C.J., and DICKSON, SULLIVAN, and RUCKER, JJ., concur.