# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 10 2017, 5:28 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Lawrence M. Hansen
Hansen Law Firm, LLC
Noblesville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jesse R. Drum
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Kyle DeHart,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | July 10, 2017<br><br>Court of Appeals Case No.<br>43A03-1611-CR-2594<br><br>Appeal from the Kosciusko Circuit Court<br><br>The Honorable Michael W. Reed, Judge<br><br>Trial Court Cause No.<br>43C01-1503-MR-2 |

**Crone, Judge.**

## Case Summary

Kyle DeHart, Brandon Woody, and Thomas Hursey went to Tara Thornburg's home and asked to purchase marijuana. They did not intend to pay for it, however, and Woody fatally shot Thornburg and her boyfriend Joshua Knisely during the robbery. The State charged both DeHart and Woody with two counts of murder and also charged DeHart with obstruction of justice. Over DeHart's objection, he was tried together with Woody. Hursey, who was also charged with murder, testified against them. The jury found DeHart and Woody guilty as charged.

On appeal, DeHart raises four arguments: (1) the State failed to present sufficient evidence to support his convictions; (2) the trial court abused its discretion in denying his motion for a separate trial; (3) the trial court abused its discretion in admitting evidence regarding rap songs; and (4) the trial court abused its discretion in admitting evidence regarding Woody's rap performance with a handgun at a party. Finding the evidence sufficient and no reversible error, we affirm DeHart's convictions.

## Facts and Procedural History

The facts most favorable to the convictions follow. DeHart was born in 1992. He and Woody went to high school together and were close friends. DeHart and Hursey were incarcerated together in 2013 and 2014 and became "[r]eally close" during that time. Tr. Vol. 3 at 36. Hursey got to know Woody in early 2015 and "accepted him because he was [DeHart's] friend." *Id*. at 37. On

February 18, 2015, the three men spent most of the day together. They also spent time with Jacob Larkin, who had bought an eighth of an ounce of "really good" marijuana from Thornburg earlier that day. Tr. Vol. 5 at 132. The four men went to DeHart's house and smoked some of Larkin's marijuana. They drove around, dropped Larkin at his house, and returned to DeHart's house. Hursey went into a room on the ground floor, and DeHart and Woody went upstairs. They came downstairs about twenty minutes later, and DeHart told Hursey that they were "trying to go pick up some weed." Tr. Vol. 3 at 47. DeHart also said, "[J]ust so you know we don't intend on paying for these trees[,]" i.e., the marijuana. *Id.* at 48. According to Hursey, "it was established that [DeHart and Woody] planned on rolling [Thornburg]. So basically talk her out of her weed, promise to pay her and later not do it." *Id.* at 49. Unbeknownst to Hursey, DeHart and Woody also planned to bind Thornburg with duct tape and slit her throat.

[4] The trio drove to Thornburg's house and arrived around midnight. DeHart saw Knisely's vehicle parked outside and said, "[O]ld boy's here." *Id.* Woody replied, "I ain't worried about him." *Id.* The three men walked through an alley to the door. DeHart was carrying a black bag containing a roll of duct tape and a utility knife. Woody knocked on the door. Thornburg, who had dated Woody in high school, let them in and led them to an upstairs room where Knisely was sleeping on a bed. Thornburg and her three visitors sat down and smoked marijuana. Woody asked Thornburg how much marijuana she had. She told him "somewhere around an ounce, maybe a little more." *Id.*

at 51. Woody said, "I want it all." *Id*. She asked him if he had "the money to cover that[,]" and he said, "[Y]eah, no problem." *Id*. Thornburg weighed out an ounce of marijuana, put it in a plastic bag, and gave it to Woody. Woody gave the bag to DeHart and "wink[ed] at him." *Id*. Thornburg asked for the money. Woody said, "[I]t's out in the car, you know, I gotta go get it." *Id*. Thornburg said, "You're not going to do this to me Brandon." *Id*.

[5] Woody removed one of his gloves, revealing a latex glove underneath. He then took a nine-millimeter handgun out of his sweatpants, stood up, and pulled back the slide. Thornburg started "screaming telling him he ain't gonna do this, he's not gonna do this." *Id*. at 52. Hursey and DeHart "jumped up simultaneously[.]" *Id*. Woody punched Thornburg and shot her in the face. Hursey saw her fall "backwards motionless" in her chair. *Id*. He also saw that Knisely was "awake in the bed now." *Id*. Hursey and DeHart ran downstairs to the car. Woody shot Knisely in the back of the neck, killing him instantly. Woody got into the car, and DeHart drove off. Woody told Hursey that if he "ever said anything about what [he] just saw [he] was going to get the same thing they just got." *Id*. at 53. DeHart threw his shoes out the car window and "made the comment it's trash day tomorrow[,]" so Woody dropped his handgun in a trash can en route to DeHart's house. *Id*. at 55.

[6] When they arrived at DeHart's house, Woody started cutting the soles off his shoes. DeHart said, "[N]o, you gotta burn them. You gotta make them disappear." *Id*. at 56. DeHart asked Hursey to get a bottle of lighter fluid from a nearby shelf. Hursey handed the bottle to Woody, who used the lighter fluid

to set his shoes on fire in the backyard. DeHart picked up some gloves and hats and told Woody to burn those too because "[h]e didn't know which ones had the gunpowder on them." *Id.* at 57. The stolen marijuana was "dumped" on a table, and DeHart "told Woody to burn the [plastic] bag" because Thornburg's "prints would be on it." *Id.*

[7] Woody then emptied the black bag that DeHart had brought to Thornburg's house, and "a utility knife hit the table." *Id.* Woody remarked, "[G]ee, the duct tape is missing." *Id.* DeHart told him to look for it. Woody searched the car and said, "[I]t's not out there." *Id.* at 58. DeHart asked where it was, and Woody "said it's either in [Thornburg's] house somewhere or the alley." *Id.* at 58. DeHart replied, "[Y]ou're stupid, you're stupid…. [Y]ou just took two lives for an ounce of weed." *Id.* Woody said that Thornburg was "getting too loud[,]" and he thought that "she was going to wake up the grandma that was at the residence[,]" so he "panicked and shot her." *Id.* He also said that "the gun had jammed and that he had dropped all the rounds except for the last one on the floor[,]" and "he shot [Knisely] in the head and [saw] his brains fly out with the last bullet." *Id.* Woody said that he "couldn't stick to the original plan" because DeHart and Hursey "ran out of the house[,]" so he "couldn't very well tape [Thornburg] up and slit her throat[.]" *Id.* at 59.

[8] At 12:29 a.m., Thornburg called 911 and told the operator that Woody had "knocked [her] out and shot [her] boyfriend." State's Ex. 2. Thornburg was still alive when police arrived, and she told them that Woody was the shooter. She later died from "a shock wave type trauma to the brain" as a result of the

shooting. Tr. Vol. 5 at 46. In her bedroom, police found a roll of duct tape, a glove, two nine-millimeter shell casings, and three live nine-millimeter rounds. That afternoon, police officers apprehended Woody at a gas station in a vehicle registered to DeHart's mother.

[9] Hursey initially denied that he or the others were involved in the crimes, but he later told police where DeHart discarded his shoes and Woody discarded his handgun. Police searched the roadside and found a pair of shoes that were "similar in size, shape and tread design" to "impressions made in the snow" outside Thornburg's home "on the night of the shooting." Tr. Vol. 4 at 166. Woody's handgun was never found. At DeHart's house, police found a pile of burned clothes and shoes, a bottle of lighter fluid, a utility knife, and DeHart's black bag.

[10] The State charged DeHart with two counts of murder, alleging that he knowingly or intentionally committed or attempted to commit robbery, during which Thornburg and Knisely were killed.[1] The State also charged DeHart with one count of level 6 felony obstruction of justice, alleging that he "burned [the] coat, gloves and shoes used in the crime of robbery and/or murder[.]" Appellant's App. Vol. 4 at 21. The State charged Woody with two counts of murder, alleging that he knowingly or intentionally killed Thornburg and Knisely. The State also charged Hursey with murder.

---

[1] Robbery is the knowing or intentional taking of property from another person or from the presence of another person by using or threatening the use of force on any person or by putting any person in fear. Ind. Code § 35-42-5-1.

The State filed a motion to join the defendants, which the trial court granted. DeHart filed a motion for a separate trial, which the trial court granted as to Hursey but denied as to Woody. DeHart and Woody's jury trial occurred in October 2016. Hursey testified for the State. Neither DeHart nor Woody testified. The jury found them guilty as charged. The trial court imposed consecutive fifty-five-year sentences for DeHart's murder convictions and a concurrent one-year sentence for the obstruction of justice conviction, for an aggregate sentence of 110 years. DeHart now appeals. Additional facts will be provided as necessary.

## Discussion and Decision

## Section 1 – DeHart's convictions are supported by sufficient evidence.

DeHart contends that the State failed to present sufficient evidence to support his convictions. When reviewing a sufficiency claim, we neither reweigh evidence nor judge witness credibility. *Wood v. State*, 999 N.E.2d 1054, 1063 (Ind. Ct. App. 2013), *trans. denied* (2014), *cert. denied*. "[R]ather, we consider only the evidence and reasonable inferences most favorable to the verdict." *Id*. "The factfinder is obliged to determine not only whom to believe, but also what portions of conflicting testimony to believe, and is not required to believe a witness'[s] testimony even when it is uncontradicted." *Id*. at 1064 (citation omitted). "[I]f the testimony believed by the trier of fact is enough to support the verdict, then the reviewing court will not disturb it." *Bell v. State*, 31 N.E.3d 495, 500 (Ind. 2015).

DeHart's argument is essentially an elaborate invitation to reweigh evidence and judge witness credibility, especially that of Hursey, the only eyewitness to testify about DeHart's involvement in the crimes. DeHart harps on Hursey's initial denial of his and the others' culpability, his history as a confidential informant, and his possible motives for testifying against his accomplices. The jury was made aware of all that and chose to believe Hursey's trial testimony regarding the murders and obstruction of justice. Contrary to DeHart's assertion, this testimony was not equivocal, inconsistent, or inherently improbable, and key aspects of it were supported by circumstantial evidence.[2] In accordance with our standard of review, we must decline DeHart's invitation to second-guess Hursey's credibility and the jury's verdicts.

## Section 2 – The trial court did not abuse its discretion in denying DeHart's motion for a separate trial.

Indiana Code Section 35-34-1-9(b) allows the State to try two or more defendants together. If a defendant moves for a separate trial, Indiana Code Section 35-34-1-11(b) provides that the court "shall" order a separate trial whenever it "determines that a separate trial is … appropriate to promote a fair determination of the guilt or innocence of a defendant." To show an abuse of discretion in the denial of a motion for a separate trial, "an appellant must show that in light of what occurred at trial, the denial of a separate trial subjected him to actual prejudice." *Peck v. State*, 563 N.E.2d 554, 557 (Ind. 1990).

---

[2] Consequently, we reject DeHart's incredible dubiosity claim.

[15]     DeHart claims that he "was prejudiced by the introduction of evidence against Woody which would not be admissible in a trial against DeHart alone," Appellant's Br. at 24, yet he cites no authority to support this claim. "Bald assertions of error unsupported by either cogent argument or citation to authority result in waiver of any error on review." *Pasha v. State*, 524 N.E.2d 310, 314 (Ind. 1988). DeHart also notes that "a trial court is required to grant severance where the parties['] defenses are mutually antagonistic and acceptance of one party's defense precludes the acquittal of the other." Appellant's Br. at 22 (citing *Lampkins v. State*, 682 N.E.2d 1268, 1272 (Ind. 1997)). In this case, the parties' defenses were not mutually antagonistic, and acceptance of one party's defense would not have precluded the acquittal of the other: Woody blamed Hursey for the murders, and DeHart claimed that he was at home that night. *See* Tr. Vol. 3 at 10-13 (opening statements); Tr. Vol. 6 at 34-63 (closing arguments).

[16]     DeHart also complains about "the unending drumbeat of the State arguing that both defendants were together all the time" and therefore must have "committed these murders together[,]" as well as about Jacob Larkin's testimony that he "wished DeHart would cut his ties" to Woody. Appellant's Br. at 24, 25. We are unpersuaded by DeHart's complaints because the State could have (and likely would have) elicited the same evidence against him if he had been tried separately. Moreover, we note that the trial court instructed the jury as follows:

> You must consider each crime and the evidence bearing upon it separately, for you to convict either defendant of all or any number of the crimes, you must be convinced beyond a reasonable doubt that the State has proven each of the elements of the crimes upon which you convict either Defendant. You cannot lump the evidence or crimes together and you should, of course, not convict … either Defendant of a crime upon which you are not convinced beyond a reasonable doubt of his guilt simply because you convict him of another crime concerning which you are so convinced.

Appellant's App. Vol. 2 at 76. "We presume that the jury follows the trial court's instructions." *Harris v. State*, 824 N.E.2d 432, 440 (Ind. Ct. App. 2005). In sum, DeHart has failed to establish that he was actually prejudiced by the joint trial, and therefore we find no abuse of discretion in the denial of his motion for a separate trial.

## Section 3 – The trial court did not commit reversible error in admitting evidence regarding rap songs.

[17] DeHart contends that the trial court erred in admitting evidence about rap songs performed by him and/or Woody. The decision to admit or exclude evidence is a matter within the trial court's sound discretion. *Green v. State*, 65 N.E.3d 620, 630 (Ind. Ct. App. 2016), *trans. denied* (2017).

> An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances of the case or misinterprets the law. We afford an evidentiary decision great deference upon appeal and reverse only when a manifest abuse of discretion denies the defendant a fair trial. In determining whether an evidentiary ruling affected a party's

substantial rights, we assess the probable impact of the evidence on the trier of fact.

*Id*. (citations omitted). "The improper admission of evidence is harmless error when the conviction is supported by substantial independent evidence of guilt as to satisfy the reviewing court that there is no substantial likelihood the questioned evidence contributed to the conviction." *Martin v. State*, 779 N.E.2d 1235, 1242 (Ind. Ct. App. 2002), *trans. denied* (2003).

[18] At trial, State's witness Nelson Blocher testified that he was "friends" with both DeHart and Woody, that he had "hung out" with them, and that they had performed rap songs for him. Tr. Vol. 4 at 4, 10. At the State's request, the trial court excused the jury so the parties could argue the admissibility of transcribed lyrics and audiorecordings of three rap songs, the first of which is titled "What's Beef?" State's Ex. 17.[3] Blocher testified that both DeHart and Woody had performed the song in the past and that he was "pretty sure" that Woody had written the song "before 2012." Tr. Vol. 4 at 18. According to Blocher, only Woody's voice was on the recording. In advocating its admissibility, the State emphasized the following lyrics:

> Pop, Pop, Pop
> …
> When that bullet leaves its 9 you gonna be the one deceased
> …

---

[3] The source of the transcriptions and the songs' titles is unclear. We use the titles that appear on the transcriptions.

Type to shoot you in your f\*\*kin' face
Beat so raw, head ringin' from the base
…
Ain't no goin' back you could get smoked like crack
You think you're tough sh\*t but I'ma show you what you lack
Put a pistol in your face have you starin' at the mack
Pistol whip a b\*tch have your [sic] ringin' like a bell
Tell my homey I said, "what's up" when he greet you in hell

State's Ex. 17.

[19] Regarding the second song, "KD freestyle Feb. 17," Blocher testified that both DeHart's and Woody's voices were on the recording but that he did not know who wrote it or when it was written. The State highlighted the following lyrics: "Wouldn't give a f\*\*k cuz I'll bust you f\*\*kin' tooth.… No weed, grab weed, take it to the death, Wouldn't give a f\*\*k, what you talkin' 'bout my n\*gga, Wouldn't give a f\*\*k, he pull the f\*\*kin' trigger." State's Ex. 18.

[20] And as for the third song, "Or naw (remix)," Blocher testified that both DeHart's and Woody's voices were on the recording, that he did not know who wrote it, and that he had heard Woody perform it "a few months prior" to the shooting. Tr. Vol. 4 at 19. The State emphasized the following lyrics: "Talk too much, I'll duct tape your mouth, … 9 milly gotta date with you, Leave your face, chopped and screwed, Take ya dough, I[']m hella rude[.]" State's Ex. 19.

[21] DeHart objected to the admission of the lyrics and recordings on several grounds: that they were cumulative; that they were irrelevant (and therefore

inadmissible[4]) pursuant to Indiana Evidence Rule 401; that any probative value was substantially outweighed by the danger of unfair prejudice pursuant to Indiana Evidence Rule 403; that "What's Beef?" was too "remote in time" to the offenses; and that the other songs lacked foundation because the authors and dates of authorship were unknown. Tr. Vol. 4 at 20. DeHart also joined in Woody's objection that the lyrics and recordings were inadmissible prior bad acts evidence pursuant to Indiana Evidence Rule 404(b).[5] In response, the State argued that the evidence was admissible to show "both intent and motive on both of the Defendants" and that the foregoing lyrics demonstrated the songs' relevance to the case. *Id*. at 24.

[22] The trial court concluded that admitting the evidence was "probably the right thing to do," *id*. at 26-27, citing *Bryant v. State*, 802 N.E.2d 486 (Ind. Ct. App. 2004), *trans. denied*. In that case, the defendant was accused of murdering his stepmother Carol and putting her body in the trunk of her car. At trial, the State offered into evidence "two rap song lyrics that Bryant either composed or plagiarized" as "an indication of Bryant's intent regarding Carol's murder. Both sets of lyrics contained the line: 'Cuz the 5-0 won't even know who you are when they pull yo ugly ass out the trunk of my car.'" *Id*. at 498. On appeal, Bryant argued that "this evidence was irrelevant, prejudicial and constituted

---

[4] *See* Ind. Evidence Rule 402 ("Irrelevant evidence is not admissible.").

[5] Evidence Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character" but "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

impermissible character evidence." *Id*. Another panel of this Court noted that "evidence is relevant where it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Id*. (quoting then-current version of Ind. Evidence Rule 401).[6] The panel concluded that,

> [i]nasmuch as Carol's body was recovered from the trunk of her car, and Bryant had driven that vehicle for several days visiting friends and telling them that he was the owner, the reference in the exhibits to finding a body in the trunk of "my car" made it more probable that Bryant killed Carol and placed her body in the trunk. Thus, such evidence was relevant, and the trial court did not abuse its discretion in admitting the exhibits on this basis.

*Id*.

[23] In this case, however, the contested evidence has considerably less probative value as to whether Woody and DeHart committed the charged crimes. Woody wrote "What's Beef?" more than three years before the murders, and Blocher either did not know or did not testify about when or by whom the other songs were written or when they were recorded. The songs do not specifically mention Thornburg, nor do they mention Woody and DeHart's original plan to slit her throat with a utility knife; according to Hursey, Woody said that he shot Thornburg because he "panicked[.]" Tr. Vol. 3 at 58. Thus, the songs' references to handguns and shootings are significantly less prescient and

---

[6] Evidence Rule 401 now states, "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."

probative than they might appear. *Cf. State v. Skinner*, 95 A.3d 236, 252 (N.J. 2014) ("Had defendant in this case rapped for seven minutes about murdering a man named 'Peterson,' or described in his rap lyrics the exact manner in which Peterson was to be killed, his writings would obviously hold more probative value."). Robbing and killing drug dealers is not unheard of in our society, nor is rapping about such activities, which is not illegal. The mere fact that Woody and DeHart rapped about stealing marijuana and shooting someone in the face before they robbed and killed Thornburg (and Knisely, who was in the wrong place at the wrong time) has only the slightest tendency to prove that they committed robbery and murder.

[24] Indiana Evidence Rule 403 provides that the court may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice.[7] We review this balancing for an abuse of discretion. *Dunlap v. State*, 761 N.E.2d 837, 842 (Ind. 2002). All relevant evidence is inherently prejudicial in a criminal case; "[w]hen determining likely unfair prejudicial impact, 'courts will look for the dangers that the jury will substantially overestimate the value of the evidence or that the evidence will arouse or inflame the passions or sympathies of the jury.'" *Carter v. State*, 766 N.E.2d 377, 382 (Ind. 2002). (quoting *Evans v. State*, 643 N.E.2d 877, 880 (Ind. 1994)). A respected jurist and legal scholar has stated,

---

[7] In *Bryant*, the court disposed of the defendant's Evidence Rule 403 argument by noting that he had "insisted on including the exhibits in their entirety if any part of them was to be admitted" and thus "invited any unfair prejudice resulting from the contents of the exhibits …." 802 N.E.2d at 499. That did not happen here.

> A judge balancing probative value against unfair prejudice should focus on the incremental effect of the challenged evidence, and weigh the additional probative value provided by the challenged evidence in light of other evidence already in the case against the additional potential for unfair prejudice in light of other evidence already in the case.

12 ROBERT LOWELL MILLER, JR., INDIANA PRACTICE SERIES, INDIANA EVIDENCE § 403.102 (4th ed. Dec. 2016 update) (citing *Asher v. State*, 790 N.E.2d 567, 570 (Ind. Ct. App. 2003)). Here, any additional probative value provided by the rap song evidence was minimal in light of other evidence already in the case, especially Hursey's eyewitness testimony, and the additional potential for unfair prejudice was significant in light of other evidence already in the case, especially because of the songs' profanity-laden glorification of violence, drugs, and sex.[8] Based on the foregoing, we conclude that the minimal probative value of the rap song evidence was substantially outweighed by a danger of unfair prejudice and that the trial court abused its discretion in admitting that evidence.[9]

[25] That said, we note that Thornburg, who had known Woody since high school, identified him as the person who shot her and Knisely. Both Larkin and Hursey placed DeHart with Woody after 11:00 p.m. on the night of the

---

[8] *See* State's Ex. 19 ("Bustas wanna talk, so lets talk your girlfriend's bra/She took it off, now its on the ground, she bent over,/And I put it down, I'm a real G, you just a clown … Imma count this cash, then I'll eat that p\*\*\*y out/P\*\*\*y real good, but dat papers what Im 'bout").

[9] Because we decide the issue based on Evidence Rule 403, we do not address DeHart's argument regarding Evidence Rule 404(b).

murders, contrary to the alibi testimony given by DeHart's father. Hursey testified to DeHart's participation in the robbery and his efforts to hide or destroy evidence of the crimes, and police found a pair of shoes on the side of the road and a pile of burnt clothing and shoes at DeHart's house. The day after the murders, Woody was found in a vehicle registered to DeHart's mother. In light of all this, we are satisfied that there is no substantial likelihood that the erroneously admitted evidence contributed to DeHart's convictions.

## Section 4 – The trial court did not abuse its discretion in admitting evidence regarding Woody's rap performance with a handgun.

[26] State's witness John VanderReyden testified that he attended a house party in December 2014, approximately two months before the murders. DeHart and Woody were also at the party. During the party, VanderReyden saw Woody perform a rap song with dance moves. Woody pulled a semiautomatic handgun out of his pants as part of the performance. He attempted to load the handgun, and the magazine fell to the floor. He inserted it into the handgun "following the beat of the music." Tr. Vol. 5 at 61. Woody then attempted to chamber a round by pulling back and releasing the slide, but "the slide did not return in the battery[,]" resulting in what VanderReyden termed a "failure to feed." *Id*. at 64. Woody finished the song and returned the handgun to his pants. DeHart objected to VanderReyden's testimony regarding the rap performance, and the trial court overruled the objection.

[27] On appeal, DeHart wisely does not argue that the testimony has no probative value; indeed, the evidence indicated that Woody owned a semiautomatic handgun and that the feeding mechanism had jammed in the past. But DeHart does suggest that the probative value was substantially outweighed by the danger of unfair prejudice pursuant to Evidence Rule 403 because the murder weapon was never found.[10] DeHart relies on *Hubbell v. State*, 754 N.E.2d 884 (Ind. 2001), in which our supreme court acknowledged the "general proposition" that "the introduction of weapons not used in the commission of the crime and not otherwise relevant to the case may have a prejudicial effect." *Id*. at 890 (quoting *Lycan v. State*, 671 N.E.2d 447, 454 (Ind. Ct. App. 1996)). The *Hubbell* court found that the trial court abused its discretion in admitting a handgun found in the defendant's home and bullets found in the defendant's van because there was no evidence that the handgun was used to abduct or murder the victim, who had been strangled. In this case, however, the evidence established that both Thornburg and Knisely were killed by a firearm; that Woody told Hursey that his handgun jammed and dropped several rounds on the floor, which were recovered by the police; and that Woody dropped the

---

[10] DeHart also argues that "[a] proper foundation was not laid for any appropriate determination to be made that [VanderReyden's] testimony was from a skilled witness that would be helpful to the jury and evidence constituted impermissible character evidence more prejudicial than probative under rule 404 and 403." Appellant's Br. at 28-29. DeHart cites no authority for any of these arguments, and therefore they are waived. *Pasha*, 524 N.E.2d at 314.

handgun in a trash can after the murders. As such, we find *Hubbell* unpersuasive.[11]

[28] DeHart also suggests that the testimony's probative value was substantially outweighed by the danger of unfair prejudice because he was not in the room with Woody during the rap performance. VanderReyden's testimony regarding the performance may have been prejudicial to DeHart, but DeHart has failed to establish that it was unfairly so, let alone that any unfair prejudice substantially outweighed the testimony's probative value. The State never argued that DeHart murdered Thornburg and Knisely, only that he committed or attempted to commit a robbery during which they were killed. Therefore, we affirm DeHart's convictions.

[29] Affirmed.

Baker, J., and Barnes, J., concur.

---

[11] We are also unpersuaded by DeHart's reliance on the factually distinguishable *United States v. Tanner*, 628 F.3d 890 (7th Cir. 2010), *cert. denied* (2011).