

**FILED**

Feb 28 2017, 9:38 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Christopher P. Phillips
Phillips Law Office, P.C.
Monticello, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Neil C. Albee,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | February 28, 2017<br><br>Court of Appeals Case No.<br>79A02-1606-CR-1266<br><br>Appeal from the Tippecanoe<br>Superior Court<br><br>The Honorable Sean M. Persin,<br>Judge<br><br>Trial Court Cause No.<br>79D05-1511-F6-502 |

**Barnes, Judge.**

## Case Summary

[1]     Neil Albee appeals his convictions for Level 6 felony voyeurism and Class B

misdemeanor residential entry.  We reverse.

# Issues

Albee raises two issues, which we restate as:

    I.      whether the trial court abused its discretion by admitting into evidence the victim's pre-trial and in-court identifications of Albee; and

    II      whether the evidence as a whole is sufficient to support Albee's convictions, thereby permitting his retrial.

# Facts

On October 31, 2015, Margaret Schuerger was at home in her sorority house on Purdue University's campus in Tippecanoe County. At approximately 10:30 p.m., she took a shower. While she was in the shower, Schuerger noticed someone standing outside the obscure-glass shower door. Although Schuerger could not see the person in detail, she could tell the figure was tall and dressed in dark clothing. Schuerger waited for a minute, and the shower door, which stays fastened with a magnetic closure, opened approximately one inch. Schuerger pulled the door closed again, and the figure moved away.

Schuerger finished her shower and returned to her bedroom. She was sitting on her bed texting a friend when she heard her bedroom door open. Schuerger looked up and saw the reflection of a man in the full-length mirror that connects the two rooms of her suite. Schuerger and the man "made eye contact" in the mirror for a few seconds. Tr. p. 216. The man left, and, after summoning a housemate, Schuerger called the police. Schuerger described the man she saw

in the mirror as approximately forty years old and wearing a hooded navy blue sweatshirt and jeans. She also said he had dark, curly hair that was "very distinctly matted down on his forehead." *Id.* at 217. The man was not wearing a hat.

[5] Officers from the Purdue University Police Department ("PUPD") arrived and searched the area around the sorority house. At 12:19 a.m. on November 1, 2015, the PUPD observed Albee in the parking lot adjacent to Schuerger's sorority house and detained him. Officers then accompanied Schuerger to the parking lot and asked her if she could identify "the suspect," Albee, as the man she saw in her house. *Id*. at 73.

[6] Schuerger observed Albee from approximately thirty yards away. Albee was wearing a hat. He was handcuffed, and there were at least six police officers around him. Schuerger could see three police cars. Albee was illuminated by the spotlight from one of the police cruisers. In addition to Schuerger viewing Albee from a distance, a police officer also took a picture of him with a digital camera and took it to Schuerger to view. Schuerger was not completely sure Albee was the man she saw in her house, though she testified, "I thought about where we live on college campus back in our neighborhood it's all Greek houses so most people are under the age of twenty-three. And so, it made sense that this could – this is the only person who matched the identification one hundred percent spot on." *Id*. at 238. In order to help facilitate a more certain identification, the officers asked Schuerger to go to the police station to view Albee in better lighting.

[7] When Albee arrived—in custody—at the police station, an officer escorted him to an interview room. The officer then took Schuerger into another area of the police station where she was able to watch Albee via a closed-circuit television. The officers took photographs of Albee—with and without his hat—with a digital camera and asked Schuerger to identify him from the digital image on the camera's screen. The officers did not compile a photo array or organize a lineup. Schuerger identified the image of Albee on the camera as the man she saw in her house.

[8] The State charged Albee with voyeurism, a Class B misdemeanor; voyeurism, a Level 6 felony; residential entry, a Level 6 felony; and with an habitual offender enhancement. Albee filed a motion to suppress Schuerger's identification of him, and the trial court denied that motion. In March 2016, Albee was tried by a jury, but that jury was unable to reach a verdict. On April 28, 2016, a second jury found Albee guilty of Class B misdemeanor voyeurism and Level 6 felony residential entry. During the trial, Albee objected when the State offered evidence related to Schuerger's pretrial viewings and identification of Albee and her in-court identification. Albee waived his right to a jury trial with regard to the Level 6 felony enhancement to his voyeurism conviction, and the trial court found him guilty of the enhanced charge. On May 19, 2016, the trial court sentenced Albee to an aggregate sentence of two years in the Department of Correction. Albee now appeals.

# Analysis

## I.    Identification

Albee contends the trial court abused its discretion by admitting testimony regarding Schuerger's pretrial and in-court identifications of him. "The admission or exclusion of evidence falls within the sound discretion of the trial court, and its determination regarding the admissibility of evidence is reviewed on appeal only for an abuse of discretion." *Gordon v. State*, 981 N.E.2d 1215, 1217 (Ind. Ct. App. 2013). A trial court abuses its discretion when its decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.*

> The Fourteenth Amendment's guarantee of due process of law requires the suppression of evidence when the procedure used during a pretrial identification is impermissibly suggestive. In some circumstances, a show-up identification may be so unnecessarily suggestive and so conducive to irreparable mistake as to constitute a violation of due process.

*Rasnick v. State*, 2 N.E.3d 17, 23 (Ind. Ct. App. 2013) (citations omitted), *trans. denied*. "The practice of conducting a one-on-one show-up between a suspect and a victim has been widely condemned as being inherently suggestive both by the United States Supreme Court and by this Court." *Wethington v. State*, 560 N.E.2d 496, 501 (Ind. 1990) (citing *Stovall v. Denno*, 388 U.S. 293, 87 S. Ct. 1967 (1967), and *Slaton v. State*, 510 N.E.2d 1343, 1348 (Ind. 1987)). "Even when the police use such a procedure . . . suppression of the resulting

identification is not the inevitable consequence." *Perry v. New Hampshire*, 565 U.S. 228, 239, 132 S. Ct. 716, 725 (2012).

[11]    Instead of mandating a *per se* exclusionary rule, th[is] Court held [in *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375 (1972)] that the Due Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a substantial likelihood of misidentification. [R]eliability [of the eyewitness identification] is the linchpin of that evaluation . . . . Where the indicators of [a witness'] ability to make an accurate identification are outweighed by the corrupting effect of law enforcement suggestion, the identification should be suppressed.

*Id.* at 239, 132 S. Ct. at 724-25 (quotations omitted) (citations omitted) (third, fourth, and fifth alterations in original).

[12]    Albee's claim involves a two-step analysis. *See Hubbell v. State*, 754 N.E.2d 884, 892 (Ind. 2001). "The first question is whether the initial identification procedure was unnecessarily or impermissibly suggestive . . . . The second inquiry is whether, under the totality of the circumstances, the identification was reliable even though the procedure was suggestive." *Id.* "Although not an exhaustive list," when examining the totality of the circumstances surrounding the identification, Indiana courts have considered:

The amount of time the witness was in the presence of the perpetrator and the amount of attention the witness had focused on him, the distance between the two and the lighting conditions at the time, the witness's capacity for observation and opportunity to perceive particular characteristics of the perpetrator, the lapse of time between the crime and the subsequent identification . . . .

*Flowers v. State*, 738 N.E.2d 1051, 1056 (Ind. 2000) (ellipses in original). Courts have also considered additional factors relevant in this case: "any identifications of another person," *Olson v. State*, 563 N.E.2d 565, 570 (Ind. 1990), and "the level of certainty demonstrated by the witness." *Gordon*, 981 N.E.2d at 1218. "[O]ne-on-one confrontations have been found proper where circumstances rendered an alternative approach such as a lineup impossible." *Hubbell*, 754 N.E.2d at 892.

[13] Here, Schuerger, who was texting at the time, heard a noise in her bedroom and briefly observed the reflection of a man in her mirror.[1] An hour and forty-five minutes later, police asked her to identify Albee in a parking lot under the illumination of a police vehicle's spot light. Officers referred to Albee as the "suspect," and Schuerger observed him in handcuffs and surrounded by at least six officers from the PUPD. Tr. p. 73. There were several police cars on the scene and visible to Schuerger during the show-up as well.

[14] Due at least in large part to the poor lighting in the parking lot, Schuerger was unable to identify Albee with certainty, and the officers offered her another chance to identify Albee under better lighting conditions at the police station. Although Schuerger was not certain Albee was the man she saw in her

---

[1] Although Schuerger also saw someone outside her shower door, her view of that person was obscured, and she could not see that person's facial features.

bedroom, she testified, in essence, that he was the only person in the area who matched the description of the man she saw in her bedroom. *See* Tr. p. 238.

[15] At the police station, Schuerger had two more opportunities to view Albee. The first was through a closed-circuit camera, and Schuerger was able to watch Albee for an unspecified period of time while he waited in an interrogation room.[2] Schuerger knew Albee was the same suspect she saw handcuffed and surrounded by police officers and police cars in the parking lot adjacent to her sorority house, and she knew that she was watching Albee while he was in custody at the police station. Schuerger next viewed Albee in digital photographs officers took while Albee waited in the interrogation room at the police station. Schuerger knew that the photographs she viewed depicted the suspect she saw in police custody in the parking lot and later via closed-circuit camera in an interrogation room at the police station. After she had three opportunities to view Albee, Schuerger was finally able to positively identify him.

[16] The police officers never asked Scheurger to identify the man she saw in her house from either a photo array or a lineup. Schuerger testified she was not asked to identify the man she saw in her bedroom through either a photo array or lineup because there was only one suspect. *See* Tr. pp. 78-79. With regard to

---

[2] We acknowledge Schuerger's testimony that the police officers did not ask her to identify Albee based on her observation of him through the closed-circuit television. Nonetheless, she had the opportunity to view him during the time he was in the interrogation room and knew he was the suspect in police custody.

the possibility of arranging a lineup, PUPD Officer Jared Baer testified, "What do you mean line-up . . . We don't do that and I've never heard that." Tr. pp. 323-24. In short, there is absolutely no evidence of any exigent circumstances that "precluded setting up a properly constituted lineup" or photo array for Schuerger to view. *Wethington*, 560 N.E.2d at 502. The police had no suspect except Albee.

[17] The circumstances in this case are similar to those in *Wethington*, 560 N.E.2d 496. In that case, Wethington and Pemberton forced Pat Adair and her two adult children, at gunpoint, to lie on their living room floor while the men ransacked the house and stole money and marijuana. The Adairs contacted the police, who then apprehended Wethington and Pemberton. Two hours after the commission of the crime, the police transported the suspects and Adairs to an intersection where they asked the Adairs to look at the men. While the Adairs viewed Wethington and Pemberton, Wethington and Pemberton were handcuffed. There were three police cars and at least seven police officers, most in uniform, at the intersection at the time. Finally, the officers displayed on the hood of one police car a gun and a knife police seized from Wethington. The Adairs identified Wethington as one of the men in their house, but they did not identify Pemberton with certainty. Three hours after the commission of the crime, the Adairs were taken to a fire station and seated in a conference room. While they were there, "numerous police and fire officials, some in uniform, milled about the room." *Id.* at 502. The gun and knife and the stolen marijuana were set out nearby and within the Adairs' view. The police then

escorted Wethington and Pemberton into the room. Although our supreme court concluded admission of the Adairs' pre-trial identifications was harmless beyond a reasonable doubt, it called circumstances of the identifications "egregious and . . . deserving of the strongest judicial condemnation." *Id.* at 502. Based on the totality of the circumstances in this case, we conclude the manner in which the PUPD conducted the show-ups was unnecessarily suggestive.

[18] We next turn our attention to the reliability of Schuerger's eventual identification. Schuerger testified during the suppression hearing that she only observed the reflection of the man in her bedroom "for a couple of seconds."[3] Tr. p. 70. Schuerger testified she observed the man's reflection "long enough for me to be able to see what he was wearing and he gave me eye contact" and that the image of that man has "reoccurred" in her mind since she saw it, yet she acknowledged, "It was still pretty quick." *Id.* at 65. We note that Schuerger's fleeting view of the man's reflection was significantly shorter than the opportunities witnesses had to view perpetrators in other cases in which we concluded show-ups were not unnecessarily suggestive. *See e.g. Lyles v. State*, 834 N.E.2d 1035, 1045 (Ind. Ct. App. 2005) (concluding witness had a

---

[3] We reject the State's assertion that Schuerger had two opportunities to see the man inside her house and that she was able to "match what she saw in the shower with the person she saw in her bedroom – his dark clothes for example . . . [and] was therefore able to identify that the person in the shower was the person in the bedroom." Appellee's Br. pp. 12-13. Schuerger unequivocally stated that, although she was able to determine someone was standing outside her shower door and could "see color," she did not have "face-to-face contact with that person and could not see the "details of who a person is." Tr. pp. 66-67.

sufficient opportunity to observe the appellant where witness viewed him in the middle of the day and conversed with him for several minutes at a distance of no more than five feet), *trans. denied*; *Gordon*, 981 N.E.2d at 1219 (concluding show-up identification was not unduly suggestive, in part, because witness observed the appellant "for several minutes in the middle of the day at a fairly close distance").

[19] We note that Schuerger did not have an opportunity to see Albee in the parking lot until nearly two hours after she observed the intruder's reflection.

> [I]t is permissible for a law enforcement officer to present a suspect for identification within a few hours of the commission of the crime. Identifications of a freshly apprehended suspect have been held to be not unnecessarily suggestive despite the suggestive factors unavoidably involved in such confrontations because of the value of the witness's observation of the suspect while the image of the offender is fresh in his mind.

*Lewis v. State*, 554 N.E.2d 1133, 1135 (Ind. 1990). But this rationale presumes both that the witness had an adequate opportunity to observe the perpetrator in the first place and that the witness was able to identify the subject of the show-up with a great degree of certainty; neither is true in this case.

[20] We are particularly troubled by the fact that, after Schuerger's initial inability to positively identify Albee as the intruder, the PUPD gave her additional opportunities view their sole suspect until she was able to do so. Each subsequent time Schuerger viewed Albee, it was tainted by the suggestiveness of the circumstances surrounding the prior viewings. We conclude that

Schuerger's eventual identification of Albee was not reliable. Therefore, the unnecessarily-suggestive show-up violated Albee's right to due process.

[21]     Where it is established that evidence of an out-of-court identification has been erroneously admitted based on a finding that the confrontation procedure was impermissibly suggestive, such error may be harmless constitutional error under *Chapman v. California,* 386 U.S. 18, 87 S. Ct. 824, 17 L.Ed.2d 705 (1967), *see also Moore v. Illinois,* 434 U.S. 220, 98 S. Ct. 458, 54 L.Ed.2d 424 (1977), and furthermore, a subsequent in-court identification may still be admissible if the State establishes by clear and convincing evidence that an independent basis for that in-court identification exists. *Neil v. Biggers,* 409 U.S. 188, 93 S. Ct. 375, 34 L.Ed.2d 401 (1972); *Heiman v. State* (1987), Ind., 511 N.E.2d 458; *Lyons v. State* (1987), Ind., 506 N.E.2d 813. A determination that an in-court identification by a witness was properly admitted will, in many instances, render the erroneous admission of a pre-trial identification by the same witness harmless. *United States ex rel. Moore v. Illinois,* 577 F.2d 411 (7th Cir. 1978).

*Wethington v. State*, 560 N.E.2d at 50-03 (Ind. 1990).

The inquiry with reference to the in-court identification is whether, under the totality of the circumstances surrounding the witness's initial observation of the perpetrator at the scene of the crime, the witness could resist any suggestiveness inherent in the improper confrontation staged by the police and make an accurate decision, based on that earlier contact with the perpetrator, that the person presented to him at trial was the one who committed the crime.

*Id.* at 503.

There is no independent basis for Schuerger's in-court identification in this case. The in-court identification was simply Schuerger's most recent opportunity to view Albee and was tainted by the prior, unnecessarily suggestive viewings. For the reasons discussed above—Schuerger was only in the intruder's presence for a short period of time; her attention was divided when she noticed him; and Schuerger was not able to identify Albee with certainty until the third time she saw him hours after her initial contact with the intruder—Schuerger's in-court identification was not reliable and could not overcome the suggestiveness of the pre-trial identifications. *See Wethington*, 560 N.E.2d at 503. The trial court abused its discretion by admitting both Schuerger's pretrial and in-court identifications of Albee.

## II. Double Jeopardy

Whether double jeopardy permits Albee's retrial depends on the sufficiency of the evidence. "When deciding whether retrial is permissible, we consider all of the evidence admitted by the trial court, including any erroneously admitted evidence." *Harmon v. State*, 849 N.E.2d 726, 735 (Ind. Ct. App. 2006). "If that evidence, viewed as a whole, would have been sufficient to sustain the judgment, retrial would not offend double jeopardy principles." *Id.* If not, however, the State may not retry Albee. *See id.*

> When reviewing a claim of insufficient evidence, an appellate court considers only the evidence most favorable to the verdict and any reasonable inferences that may be drawn from that evidence. If a reasonable finder of fact could determine from the evidence that the defendant was guilty beyond a reasonable

doubt, then we will uphold the verdict. We do not reweigh the evidence or judge the credibility of witnesses. These evaluations are for the trier of fact, not appellate courts. In essence, we assess only whether the verdict *could* be reached based on reasonable inferences that may be drawn from the evidence presented.

*Baker v. State*, 968 N.E.2d 227, 229 (Ind. 2012) (quotations omitted) (citations omitted).

[25] The evidence as a whole was sufficient to support Albee's convictions. That evidence included Schuerger's identification of Albee as the man whose reflection she saw in her mirror and whose clothing and build, to the extent she could see those things through the obscure glass shower door, matched those of the intruder in her bedroom. Schuerger's testimony that Albee stood outside her shower door and then opened that door is sufficient to prove the person committed voyeurism.[4] That Albee was not a resident of Schuerger's sorority house or an invited guest of a resident is sufficient to prove he knowingly or intentionally broke and entered that dwelling.[5] Because the evidence as a whole was sufficient to sustain Albee's convictions, double jeopardy does not preclude retrial. Because the law dictates that we must, we include in our review of the

---

[4] A person who knowingly or intentionally peeps into an area where an occupant of the area reasonably can be expected to disrobe, including restrooms, baths, showers, or dressing rooms without the consent of the other person commits voyeurism. Ind. Code § 35-45-4-5. The offense is elevated from a Class B misdemeanor to a Level 6 felony if the person who commits the offense has a prior unrelated conviction under this section. *Id.* "'Peep' means any looking of a clandestine, surreptitious, prying, or secretive nature." *Id.*

[5] Indiana Code Section 35-43-2-1.5 defines residential entry as knowingly or intentionally breaking and entering the dwelling of another person.

evidence the now-excluded identifications that violated Albee's right to due process.

## Conclusion

[26] The circumstances surroundings Schuerger's pre-trial identification of Albee were unnecessarily suggestive, and those identifications were so unreliable that Albee's right to due process was abridged when the trial court admitted his identifications into evidence. The evidence as a whole, however, was sufficient to support Albee's convictions for voyeurism and residential entry. Retrial would not offend double jeopardy principles. We reverse.

[27] Reversed.

Kirsch, J., and Robb, J., concur.