# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 02 2019, 10:26 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Scott King
Russell Brown
King, Brown & Murdaugh, LLC
Merrillville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Matthew B. MacKenzie
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

Darianna Hamblin,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

April 2, 2019

Court of Appeals Case No.
18A-CR-1132

Appeal from the Lake Superior Court

The Honorable Salvador Vasquez, Judge

Trial Court Cause No.
45G01-1512-MR-7

**Robb, Judge.**

# Case Summary and Issues

[1] Following a jury trial, Darianna Hamblin was convicted of murder while committing robbery, a felony, and attempted armed robbery, a Level 3 felony. Hamblin appeals her convictions raising two issues for our review: (1) whether the trial court abused its discretion in admitting evidence of a photo array and the victims' subsequent testimony; and (2) whether the State presented sufficient evidence to sustain her conviction of attempted armed robbery under a theory of accomplice liability. Concluding the trial court did not abuse its discretion and the State presented sufficient evidence to sustain Hamblin's conviction, we affirm.

# Facts and Procedural History

[2] On December 20, 2015, Cailin Scott was searching Craigslist for a vehicle to fix up and sell when he located a 2008 Chevy Impala listed for $4,000. The seller told Scott that he could see the vehicle at an address in Gary that, unbeknownst to Scott, was currently vacant. Scott contacted his friend, Talion "Chase" McNeil, to ride with him to Gary, help assess the vehicle, and to drive the vehicle back home should he decide to purchase it. Both Scott and McNeil possessed valid handgun permits and they brought firearms along with them.

[3] Scott and McNeil arrived at the address shortly before 7:00 p.m. that evening. The house was dark, but they noticed several individuals standing by a vehicle matching the description of the Impala about a block away. Scott called the

seller thinking they had the wrong address, but she told Scott that she would be out soon. A few minutes later, the seller called Scott and told him that she was standing in front of his car.[1] Scott and McNeil exited their vehicle, shook the female's hand, and once she asked if Scott had "the cash[,]" she informed them that the "car was around back[,]" apparently referring to the back of the house. Transcript, Volume 1 at 105. At that point, the Impala turned down the street and Scott noted to McNeil, "that looks like the car there, but they just drove past us." *Id.* Scott described the female as "about five, one, five feet tall. She had twisties or dreadlocks hanging around the length of her shoulders, had on a sweat suit, sweat pants, sweatshirt." *Id.* at 107. Scott later added that the sweat suit was "[g]ray." *Id.*

[4]     As the female showed Scott and McNeil around to the side of the house, a "male figure . . . came from behind the house [with] a firearm." *Id.* at 113. The male, later identified as Brandon Johnson, pointed his handgun at Scott and demanded their money while the female drew a handgun and pointed it at McNeil. McNeil threw his wallet, placed his hands on the ground, and said "do not shoot." *Id.* at 120. As Johnson's focus was on McNeil, Scott charged[2] his handgun behind his back. Johnson then turned to Scott and placed his gun on Scott's stomach. Scott told Johnson to "calm down, just stop." *Id.* Johnson

---

[1] It is not clear from the record where the female came from or why Scott and McNeil failed to see her approach their car.

[2] "Charging" a handgun refers to the act of manually pulling back the slide until a round is chambered.

continued to press his handgun into Scott's stomach so Scott grabbed Johnson's handgun with his left hand, drew his own handgun, and shot Johnson. *Id.* Johnson "staggered back" with his handgun still pointed forward and Scott continued to fire until Johnson fell.[3] *Id.* at 121. At that point, McNeil drew his handgun and fired at the female, who turned and ran "towards the back of the house into the woods area . . . ." *Id.* at 123. As she ran, the female swung her arm behind her and, as McNeil later explained:

> My reaction was if she were to start shooting, we could possibly be shot or someone across the street could possibly be shot, so I made the decision to start firing at her.

Tr., Vol. 2 at 32-33.

[5] McNeil and Scott returned to Scott's car, called 911, and waited for the police in a nearby parking lot. Police were dispatched to a report of a gunshot wound at approximately 7:00 p.m. During the ensuing investigation, police learned that Hamblin had checked herself into the emergency room at a nearby hospital at 7:10 p.m. with multiple gunshot wounds and had stated that "she was involved" in an incident at the same address. *Id.* at 128. Hamblin told investigators that she saw Johnson, her cousin, with an unknown male, she ran over when she heard gun shots, she was then shot herself, and was driven to the hospital by a friend.

---

[3] Johnson later died as the result of his injuries.

[6]     On December 21, 2015, Scott and McNeil were brought to the police station to view a photo array. Separately, Detective Minchuk took them into a room to view six photographs of similar looking women arranged on a table and asked them whether "any of [the] pictures look[ed] familiar[.]" *Id.*, Vol. 3 at 113. Scott quickly selected Hamblin, writing "I am drawn to this picture more than the other inmates. Based on the hair and lips in the involvement of the shooting." Exhibits at 59-60. McNeil took two to three minutes to narrow his selection down to two photographs, but he was unable to select one. One of the two photographs that he selected was also Hamblin.

[7]     On December 22, 2015, the State charged Hamblin with murder while committing robbery, a felony, and two counts of attempted armed robbery, both Level 3 felonies. The State eventually filed an amended information adding two counts of attempted armed robbery, both Level 2 felonies. Hamblin filed a motion to suppress on December 27, 2016, arguing the lineup used to identify her was improper and unduly suggestive. The trial court denied Hamblin's motion on March 23, 2017.

[8]     At trial, Scott and McNeil identified Hamblin as the female who participated in the robbery, over Hamblin's continuing objection. The jury found Hamblin guilty on all counts and the trial court entered judgments of conviction for felony murder and one count of attempted armed robbery. Hamblin was sentenced to an aggregate term of 52 years in the Indiana Department of Correction. Hamblin now appeals.

# Discussion and Decision

## I. Identification Evidence

### A. Standard of Review

[9] The admission of evidence is within the trial court's discretion and the decision is reviewable only for an abuse of discretion. *Albee v. State*, 71 N.E.3d 856, 860 (Ind. Ct. App. 2017). A trial court abuses its discretion when its decision is clearly against the logic and effect of the facts and circumstances before it. *Id.* In order for identification procedures used by the police to be admissible, they must comport with a defendant's due process rights. *Allen v. State*, 813 N.E.2d 349, 360 (Ind. Ct. App. 2004), *trans. denied*. "The task of this Court is to determine whether, under the totality of the circumstances, the identification process was conducted in such a manner that it created a substantial likelihood of irreparable misidentification." *Jackson v. State*, 33 N.E.3d 1067, 1072 (Ind. Ct. App. 2015), *trans. denied*. "If, under the totality of the circumstances, the reviewing court finds the out-of-court procedures were not impermissibly and unnecessarily suggestive, both the evidence of the pretrial lineup and the in-court identification are considered to have been properly admitted by the trial court, and there is no need to proceed further." *Harris v. State*, 619 N.E.2d 577, 580 (Ind. 1993).

### B. The Photo Array Was Not Impermissibly Suggestive

[10] Hamblin begins by arguing the trial court abused its discretion by admitting evidence of the photo array and allowing Scott and McNeil, who were "tainted

by the impermissibly suggestive procedure[,] to identify Hamblin in court."
Amended Brief of Appellant at 8.

[11]     In *Parker v. State*, our supreme court explained:

> Factors to be considered in evaluating the likelihood of a misidentification include (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, and (4) the level of certainty demonstrated by the witness. Among other factors the court may consider are (1) the manner and form in which the police asked the witness to identify the suspect and the witness's interpretation of their directives and (2) whether the police focused on the defendant as the prime suspect, either by their attitude or the makeup of the photo array.

698 N.E.2d 737, 740 (Ind. 1998) (citations and quotations omitted).

[12]     Hamblin's argument tracks these six factors in alleging the photo array resulted in a high likelihood of misidentification. Beginning with the first and second factors, Hamblin highlights the attempted robbery's brief time frame, relative darkness, and Scott and McNeil's focus on Johnson as reasons "that neither victim had a true opportunity to observe the female perpetrator at the time of the crime." Amended Br. of Appellant at 10. Although brief, this was "not a crime like a mugging or purse snatching where the victim gets only a glance at the attacker." *Williams v. State*, 774 N.E.2d 889, 891 (Ind. 2002). The record reflects Scott and McNeil's meeting with Hamblin was initially hospitable and a street light allowed Scott and McNeil to view Hamblin clearly when she shook

their hands from approximately a foot away. Hamblin then continued in their presence until the attempted robbery. For these reasons, we conclude Scott and McNeil had a sufficient opportunity to view Hamblin. And, having had such an opportunity and remaining in her continued presence, we further conclude Scott and McNeal's degree of attention during the crime itself was rather immaterial for the purposes of her identification.

[13] Hamblin next argues Scott and McNeil's description was "so lacking in detail . . . as to be incapable of evaluation and/or so vague as to be inaccurate[,]" and "neither witness displayed any certainty of the female perpetrator's identity[,]" when selecting the photographs from the array. Amended Br. of Appellant at 11. Scott described the female as "about five, one, five feet tall . . . [with] twisties or dreadlocks hanging about the length of her shoulders, [and] had on a [gray] sweat suit, sweat pants, sweatshirt." Tr., Vol. 1 at 107. This description identified the suspect's height, clothing, and a specific hairstyle. Under such circumstances, we cannot say the description was "so lacking in detail . . . as to be incapable of evaluation[.]" Amended Br. of Appellant at 11. And, to the extent Scott or McNeil demonstrated any uncertainty, this was placed in front of the jury and we believe it goes to the evidence's weight, not its competency.

[14] Neither of the additional factors outlined in *Parker* lead us to conclude the photo array was constitutionally unsound. Hamblin makes much of the absence of an express statement that the defendant may not appear in the photo array. Although we agree that an express advisement would constitute a better practice, the context of Detective Minchuk's instruction, asking whether "any

of [the] pictures look[ed] familiar[,]" tr., vol. 3 at 113, would suggest to a reasonable person that they were free to answer in the negative. *See Allen,* 813 N.E.2d at 360 (holding similar language, asking whether the victim "recognized anyone from the six photographs[,]" was not unduly suggestive).

[15] Nor do we find Hamblin's photograph to be unduly suggestive. Detective Minchuk testified that it typically takes him 15-20 minutes to assemble a photo array but this one took him several hours because he had to use photographs from the Indiana Bureau of Motor Vehicles to ensure similarity. All six photographs were headshots with blue backgrounds taken from the same distance, featuring similar looking African-American women with similar hairstyles. To the extent Hamblin argues her photograph was the only one "that had hair fitting the description of 'dreads' that were long enough to be visible by one wearing a hoodie[,]" Amended Br. of Appellant at 12, we remind Hamblin that police are not required to "perform the improbable if not impossible task of finding four or five other people who are virtual twins to the defendant." *Jackson*, 33 N.E.3d at 1073 (quoting *Pierce v. State*, 267 Ind. 240, 246, 369 N.E.2d 617, 620 (1977)).

[16] Therefore, under the totality of the circumstances, we conclude the photo array was not impermissibly suggestive. As such, both the evidence of the photo array and the victims' subsequent in-court identifications were properly admitted. *See Harris*, 619 N.E.2d at 580.

# II. Sufficiency of the Evidence

## A. Standard of Review

[17] When reviewing the sufficiency of the evidence required to support a criminal conviction, we do not reweigh the evidence or judge the credibility of the witnesses. *Purvis v. State*, 87 N.E.3d 1119, 1124 (Ind. Ct. App. 2017). Rather, we only consider the evidence most favorable to the verdict and any reasonable inferences drawn therefrom. *Id*. We will affirm "if there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt." *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009).

## B. Attempted Armed Robbery

[18] The State bears the burden of proving all elements of the charged crime beyond a reasonable doubt. *Taylor v. State*, 587 N.E.2d 1293, 1301 (Ind. 1992); Ind. Code § 35-41-4-1(a) ("A person may be convicted of an offense only if his guilt is proved beyond a reasonable doubt."). A person who "knowingly or intentionally takes property from another person" by "using or threatening the use of force on any person" commits robbery, a Level 5 felony. Ind. Code § 35-42-5-1(a). However, the offense is a Level 3 felony if it is committed while armed with a deadly weapon or results in bodily injury to any person other than a defendant. *Id.* Indiana's attempt statute states: "A person attempts to commit a crime when, acting with the culpability required for commission of the crime, the person engages in conduct that constitutes a substantial step toward

commission of the crime.  An attempt to commit a crime is a felony or misdemeanor of the same level or class as the crime attempted."  Ind. Code § 35-41-5-1(a).

[19]  Furthermore, "[a] person who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense . . . ."  Ind. Code § 35-41-2-4.

> An accused's mere presence at the scene of the crime is insufficient to establish that he aided another person to commit an offense.  Similarly, mere acquiescence in the commission of the offense is insufficient to convict a person as an accomplice.  Rather, in order to sustain a conviction as an accomplice, there must be evidence of the defendant's affirmative conduct, either in the form of acts or words, from which an inference of a common design or purpose to effect the commission of a crime may be reasonably drawn.

*Peterson v. State*, 699 N.E.2d 701, 706 (Ind. Ct. App. 1998) (citations omitted).

[20]  In determining whether a person aided another in the commission of a crime, a reviewing court considers: (1) presence at the scene of the crime; (2) companionship with another engaged in criminal activity; (3) failure to oppose the crime; and (4) the defendant's conduct before, during, and after the occurrence of the crime.  *Woods v. State*, 963 N.E.2d 632, 634 (Ind. Ct. App. 2012).  Evidence must exist from which a jury can conclude that a defendant was engaged in the actus reus or was engaging in behavior which would facilitate the commission of the crime.  *Chappell v. State*, 966 N.E.2d 124, 130 (Ind. Ct. App. 2012), *trans. denied*.

[21]     Hamblin argues she was "never in the same location as the perpetrator[,]" there was no evidence that "she acquiesced in the commission of the crime or actively assisted the perpetrator[,]" and there was no evidence that she "actually wielded a weapon or made any demand for money[.]" Amended Br. of Appellant at 17. However, as aptly noted by the State, Hamblin's argument "flatly ignores the evidence presented to the jury." Brief of Appellee at 20.

[22]     Viewed most favorably to the jury's verdict, the evidence reveals that Hamblin worked with her cousin, Johnson, to initiate a fraudulent sale of a vehicle with the goal of robbing a potential buyer. After arranging for a meeting at a vacant property, Hamblin asked Scott and McNeil if they had "the cash" before luring them to the side of the house. Tr., Vol. 1 at 105. Johnson emerged wielding a gun and demanded Scott and McNeil's money while Hamblin pulled a handgun of her own, aimed it at Scott and McNeil, and fled the scene only after Johnson was shot by Scott and McNeil began shooting at her. Scott and McNeil's testimony was corroborated by the physical evidence recovered at the scene and the fact that Hamblin checked herself into a nearby hospital minutes after the shooting.

[23]     This evidence supports a conclusion: (1) Hamblin was present at the scene of the crime; (2) Hamblin was the companion of Johnson, her cousin, and worked in concert with him; (3) Hamblin worked in furtherance of the crime and failed to oppose it; and (4) Hamblin's conduct before, during, and after the occurrence of the crime supported a conclusion that she knowingly and intentionally aided

Johnson in the commission of the crime. *Woods*, 963 N.E.2d at 634. Put simply, this evidence is more than sufficient to support Hamblin's conviction.

# Conclusion

[24] For the reasons set out above, we conclude the trial court did not abuse its discretion in admitting evidence of the photo array and the victims' subsequent in-court identification and the State presented sufficient evidence to support Hamblin's conviction of attempted armed robbery. We therefore affirm in all respects.

[25] Affirmed.

Riley, J., and Kirsch, J., concur.