

I N  T H E

# Court of Appeals of Indiana

Andrew D. Wallace,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

FILED

Dec 27 2024, 9:36 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

December 27, 2024

Court of Appeals Case No.
24A-CR-1436

Appeal from the Marion County Superior Court

The Honorable Charnette D. Garner, Judge
The Honorable Michelle Waymire, Magistrate

Trial Court Cause No.
49D35-2403-CM-006383

**Opinion by Judge DeBoer**

Judges May and Tavitas concur.

**DeBoer, Judge.**

## Case Summary

[1] Following a bench trial, Andrew Wallace was convicted of Class A misdemeanor Battery Resulting in Bodily Injury[1] and Class A misdemeanor Resisting Law Enforcement.[2] Wallace raises two issues on appeal, which we restate as: (1) whether the trial court abused its discretion and violated Wallace's due process rights by admitting evidence of the victim's pretrial "show-up"[3] identification of Wallace; and (2) whether the State presented sufficient evidence to support his conviction for resisting law enforcement. We affirm.

## Facts and Procedural History

[2] On March 3, 2024, Eric Johnson left his apartment in the City of Lawrence to go to a nearby gas station around 10:30 p.m. As Johnson locked his door, he saw a female neighbor in her car "yelling at [Wallace] as he was walking away." *Transcript Vol. 2* at 68. Johnson knew Wallace to be her boyfriend. The

---

[1] Ind. Code 35-42-2-1(c)(1), (d)(1)

[2] I.C. 35-44.1-3-1(a)(3).

[3] A "show-up" is an "out-of-court confrontation conducted by police for the purpose of allowing a witness to identify a suspect." *Flowers v. State*, 738 N.E.2d 1051, 1056 (Ind. 2000), *reh'g denied*.

neighbor asked Johnson to "carry a bag upstairs for her" and Johnson obliged. *Id.* at 69. As Johnson walked up the steps to his neighbor's apartment, Wallace "[came] back from where he had walked off to," "got directly beside" Johnson, and "hauled off and punched [him] in the side of [his] face." *Id.* Wallace said, "I been [sic] waiting for your punk ass." *Id.* Wallace hit Johnson "several times," then Johnson grabbed him, and they fell to the ground. *Id.* at 70. Wallace kicked, punched, and stomped on him. Johnson suffered three lacerations on his face, a knot on the top of his head, and pain from the assault.

[3] Within minutes of the assault, Johnson went to a different neighbor's home and she called the police. Officer Gustavo Canas ("Officer Canas") arrived and spoke briefly with Johnson at 10:58 p.m. Johnson told Officer Canas that his neighbor's boyfriend had "hauled off" and "coldcocked" him, hitting him in the eye. *Defense Ex. A*. Johnson reported the man "grabbed [Johnson's] hoodie and pulled it over [his] head and just kept swinging on [him]." *Id.* Johnson told Officer Canas the man was wearing a "red hoodie and some green pants." *Id.* Johnson identified his attacker as Andrew Wallace, which allowed Officer Canas to run the name "through NCIC and BMV"[4] databases and obtain an image of Wallace. *Tr. Vol. 2* at 85. Officer Canas photographed Johnson's injuries then left to write his report about the incident.

---

[4] "NCIC" refers to the National Crime Information Center. "BMV" stands for the Bureau of Motor Vehicles.

[4] Approximately fifteen minutes after leaving the apartment complex, Officer Canas received a second dispatch that Wallace had returned to the scene and was knocking on a second-floor apartment door. Officer Canas returned in "[l]ess than a minute" and observed Wallace knocking on a door before walking to the "bottom of the complex[.]" *Tr. Vol. 2* at 90. Officer Canas, "in full police uniform," confronted Wallace and pointed his taser at him. Wallace, wearing a green hoodie and khaki pants, was ordered to "put his hands up in the air." *Id.* Wallace did not comply and began "cussing [Officer Canas] out" and walking towards him in an "aggressive" and "threatening" manner. *Id.* at 91. Officer Canas instructed Wallace to "stop and put his hands up in the air" but Wallace told Officer Canas to "F off" and ran away. *Id.* Officer Canas again commanded, "stop, police[,]" gave chase, and deployed his taser on Wallace's back, subduing him. *Id.* at 91-92.

[5] Shortly thereafter, Officer Canas and another responding officer returned to Johnson's apartment and asked him to verify whether Wallace was the person who had attacked him. Johnson stepped outside of his apartment and looked down to the street level where Wallace was in handcuffs standing next to an officer. The officer directed his flashlight at Wallace so Johnson had a "clear line of sight" and "could see [Wallace] clear as day." *Id.* at 75, 76. Johnson identified Wallace as the person who struck him.

[6] On March 4, 2024, the State charged Wallace with Count I: Battery Resulting in Bodily Injury, a Class A misdemeanor, and Count II: Resisting Law Enforcement, a Class A misdemeanor. Following a bench trial, the trial court

found Wallace guilty as charged. He was sentenced to concurrent sentences of 365 days on each Count, ninety days to be served incarcerated and the remainder suspended to probation.

## Discussion and Decision

## 1. Identification.

[7] Wallace argues the improper show-up identification procedure used by the police violated his due process rights under the Fourteenth Amendment to the United States Constitution,[5] and that without the pretrial identification, the evidence was insufficient to support his battery conviction. Wallace's claim is more properly framed as whether, under these circumstances, the trial court abused its discretion by admitting evidence of the show-up identification at trial when the identification procedure the police used was, according to Wallace, unnecessarily suggestive and the resulting identification unreliable, thereby violating his right to due process.[6]

---

[5] Wallace's brief contains a single, conclusory sentence arguing that the show-up procedure "also violated Article One Sec. 12 of the Indiana Constitution which mandates that the Court follow the "Due Course of Law" in providing defendants with a fair trial." *Appellant's Br.* at 10. Our Indiana Supreme Court has conducted an extensive review of the due course of law provision and its history and determined "the Due Course of Law provision is applicable to civil proceedings, but provides none of the criminal protections of its federal counterpart." *Sanchez v. State*, 749 N.E.2d 509, 514 (Ind. 2001). Although some criminal protections are embodied in the second sentence of Article 1, Section 12, Wallace's argument specifically invokes the due course of law provision, which, "by its terms, . . . applies only in the civil context." *Id.* It has been long established that "[w]e are bound by the decisions of our supreme court." *Moore v. State*, 839 N.E.2d 178, 185 n.4 (Ind. Ct. App. 2005), *trans. denied*.

[6] The State argues, and we agree, that Wallace waived this appellate argument by failing to object at trial to the admission of evidence related to the show-up identification. *McBride v. State*, 992 N.E.2d 912, 918 (Ind. Ct. App. 2013) ("To preserve an error for review, the specific objection relied upon on appeal must have been

---

[8]     In support of his claim that the procedure used by police was suggestive and the identification unreliable, Wallace points out that he was handcuffed during the show-up identification, Johnson may have been blinded during the altercation, and Johnson told the responding officer the perpetrator was wearing different colored clothing than what Wallace was wearing when arrested. Determinations regarding the admission or exclusion of evidence fall within the sound discretion of the trial court and are reviewed on appeal only for an abuse of discretion. *Albee v. State*, 71 N.E.3d 856, 860 (Ind. Ct. App. 2017). "A trial court abuses its discretion when its decision is clearly against the logic and effect of the facts and circumstances before the court." *Id.*

[9]     The guarantee of due process contained in the Fourteenth Amendment[7] to the United States Constitution "requires suppression of testimony concerning a pre-trial identification when the procedure employed is impermissibly suggestive." *Harris v. State*, 716 N.E.2d 406, 410 (Ind. 1999); *Perry v. New Hampshire*, 565 U.S. 228, 238, 132 S.Ct. 716, 724, 181 L.Ed.2d 694 (2012) ("[D]ue process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary."). In some instances, "a show-up procedure may be so unnecessarily suggestive and so conducive to

---

stated in the trial court as a basis for the objection. Thus, a claim may be waived for the purposes of an appeal where the defendant failed to object that the evidence was improperly admitted."), *trans. denied*. (internal citations omitted). Waiver notwithstanding, we will address the merits of Wallace's argument.

[7] The relevant constitutional text states "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV § 1.

irreparable mistake as to constitute a violation of due process." *Hubbell v. State*, 754 N.E.2d 884, 892 (Ind. 2001) (citing *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), *overruled on other grounds by Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987)).

[10] Both the United States Supreme Court and Indiana Supreme Court have widely condemned "[t]he practice of conducting a one-on-one show up between a suspect and a victim" as being inherently suggestive. *Wethington v. State*, 560 N.E.2d 496, 501 (Ind. 1990); *see also Stovall*, 388 U.S. at 301-02, 87 S.Ct. at 1972 ("The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned."); *Slaton v. State*, 510 N.E.2d 1343, 1348 (Ind. 1987). However, suppression of the identification resulting from a show-up is not an inevitable consequence. *Perry*, 565 U.S. at 239, 132 S.Ct. at 724.

> Instead of mandating a *per se* exclusionary rule, . . . the Due Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a substantial likelihood of misidentification. [R]eliability [of the eyewitness identification] is the linchpin of that evaluation[.] . . . Where the indicators of [a witness'] ability to make an accurate identification are outweighed by the corrupting effect of law enforcement suggestion, the identification should be suppressed.

*Id.* at 239, 132 S.Ct at 724-25 (internal citations and quotations omitted); *Albee*, 71 N.E.3d at 860.

[11]   Accordingly, "[t]he first question is whether the initial identification procedure was unnecessarily or impermissibly suggestive[,]" and "[t]he second inquiry is whether, under the totality of the circumstances, the identification was reliable even though the procedure was suggestive." *Hubbell*, 754 N.E.2d at 892. When examining whether the totality of circumstances show the identification was reliable, Indiana courts consider factors such as:

> (1) the opportunity of the witness to view the offender at the time of the crime; (2) the witness's degree of attention while observing the offender; (3) the accuracy of the witness's prior description of the offender; (4) the level of certainty demonstrated by the witness at the identification; and (5) the length of time between the crime and the identification.

*Rasnick v. State,* 2 N.E.3d 17, 23 (Ind. Ct. App. 2013)*, trans. denied*.

## A. Suggestiveness of the procedure.

[12]   On the first question, we reject the notion that this show-up identification was unnecessarily suggestive. Our Indiana Supreme Court has stated:

> [I]t is permissible for a law enforcement officer to present a suspect for identification within a few hours of the commission of the crime. Identifications of a freshly apprehended suspect have been held to be not unnecessarily suggestive despite the suggestive factors unavoidably involved in such confrontations because of the value of the witness's observation of the suspect while the image of the offender is fresh in his mind.

*Lewis v. State*, 554 N.E.2d 1133, 1135 (Ind. 1990) (concluding a show-up identification two and one-half hours after the crime was not unnecessarily

suggestive); *see also Rasnick*, 2 N.E.3d at 24 (concluding a show-up identification was not unduly suggestive "most importantly because the identification occurred within thirty minutes of the crime," and distinguishing *Hubbell* and *Wethington* where show-up identifications occurred six hours and two hours, respectively, after the crimes, and carried indicia of unreliability); *Albee*, 71 N.E.3d at 863 (stating that the rationale for permitting near-in-time show-up identifications "presumes both that the witness had an adequate opportunity to observe the perpetrator in the first place" and could "identify the subject of the show-up with a great degree of certainty"). Here, the show-up identification occurred approximately one hour after the attack and thirty minutes after Officer Canas originally spoke with Johnson. Wallace was presented in handcuffs at the show-up "because he fled from" Officer Canas and needed to be apprehended. *Tr. Vol. 2* at 98. Given the short period of time between the commission of the crime and law enforcement's use of the show-up procedure, and because Johnson was familiar with Wallace, "had an adequate opportunity to observe the perpetrator in the first place," and swiftly identified Wallace at the show-up, it was within the trial court's discretion to conclude the show-up identification was not unnecessarily suggestive. *Albee*, 71 N.E.3d at 863.

## B. Reliability of the identification.

[13] Addressing the second inquiry, the totality of the circumstances surrounding this show-up identification lean significantly in favor of finding Johnson's identification of Wallace was reliable, unlike the identification considered in *Albee*. *Albee*, 71 N.E.3d at 862-63. In *Albee*, Schuerger noticed someone

watching her while in the shower and later made eye contact with a man for a few seconds through a mirror that connected two rooms in her sorority house on Purdue University's campus. *Albee*, 71 N.E.3d at 858-59. Schuerger described the man to university police and officers arrested Albee later that evening. *Id.* at 859. Illuminated by a police cruiser's spotlight, Schuerger viewed a handcuffed Albee nearly two hours after the incident and from approximately thirty yards away but she could not be sure Albee was the man she had seen in the house. *Id.*

Police requested Schuerger accompany them to the police station where she identified Albee as the man she saw in her sorority house after watching Albee through a closed-circuit television and reviewing multiple photographs officers took of him. *Id.* This Court concluded the show-up was unnecessarily suggestive, unreliable, and violated Albee's right to due process, noting Schuerger's "fleeting view of the man's reflection" at a time when "her attention was divided," and because the show-up did not occur until "nearly two hours" after the fact. This Court also took issue with the "troubl[ing] fact" that the police gave Schuerger additional opportunities to view their sole suspect after she was unable to positively identify him at the show-up. *Id.* at 862-63.

Unlike the victim in *Albee*, Johnson, who already knew Wallace as his neighbor's boyfriend, observed Wallace approach him and get very close before "haul[ing] off and punch[ing] him in the face." *Tr. Vol. 2* at 69. This fact flies in the face of Wallace's assertion that Johnson was "blinded" and "merely

assumed" it was Wallace that hit him. *Appellant's Br.* at 8, 10. Further, not only could Johnson see Wallace as he approached him, but Johnson could identify him by name.

[16] Wallace also claims Johnson's identification was not reliable because Johnson's description of his attacker's clothing at the time of the attack did not match that which Wallace was wearing when he was arrested. In response, the State notes Wallace had time and plausibly could have changed his clothes before being apprehended by police. We find Wallace's claim unavailing because Johnson identified Wallace as his neighbor's boyfriend *before* Officer Canas asked him to describe the clothing worn by the perpetrator. It is evident that Johnson recognized Wallace based on his familiarity with Wallace's status as his neighbor's boyfriend, not because of the clothes Wallace was wearing when he attacked Johnson. Finally, when the show-up identification procedure was conducted one hour after the battery occurred, Johnson "could see [Wallace] clear as day" and swiftly identified Wallace as his attacker. *Tr. Vol. 2* at 75.

[17] The show-up procedure was not unnecessarily suggestive, and the totality of the circumstances demonstrate the identification was reliable and did not violate Wallace's due process rights. The trial court did not abuse its discretion when it admitted evidence of the show-up identification.

## 2. Resisting Law Enforcement.

[18] Wallace argues the State introduced insufficient evidence to convict him of Class A misdemeanor resisting law enforcement because Officer Canas's

specific command did not require Wallace to "stay in the same place or that he was being detained for questioning," and implied he was "free to leave the scene as long as he did not continue to walk toward the officer." *Appellant's Br.* at 11.

[19] Our standard of review for sufficiency of the evidence challenges is well settled. *Teising v. State*, 226 N.E.3d 780, 783 (Ind. 2024). Sufficiency claims "trigger a deferential standard of review in which we 'neither reweigh the evidence nor judge witness credibility, instead reserving those matters to the province of the [trier of fact].'" *Hancz-Barron v. State*, 235 N.E.3d 1237, 1244 (Ind. 2024) (quoting *Brantley v. State*, 91 N.E.3d 566, 570 (Ind. 2018), *reh'g denied, cert. denied*). "A conviction is supported by sufficient evidence if 'there is substantial evidence of probative value supporting each element of the offense such that a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.'" *Id.* (quoting *Willis v. State*, 27 N.E.3d 1065, 1066 (Ind. 2015)). When conducting this review, "we consider only the evidence that supports the [fact-finder's] determination, not evidence that might undermine it." *Id.* We will "affirm a defendant's conviction unless 'no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt.'" *Teising*, 226 N.E.3d at 783 (quoting *Jenkins v. State*, 726 N.E.2d 268, 270 (Ind. 2000)).

[20] A person commits Class A misdemeanor resisting law enforcement when he knowingly or intentionally "flees from a law enforcement officer after the officer has, by visible or audible means, . . . identified himself or herself and

ordered the person to stop." I.C. § 35-44.1-3-1(a)(3). Here, Officer Canas approached Wallace in his full police uniform, pointed his taser at Wallace, and told Wallace to "put his hands up in the air." *Tr. Vol. 2* at 90. Wallace walked aggressively toward Officer Canas, who again ordered him to "stop and put his hands up in the air." *Id.* at 91. At that time, Wallace told Officer Canas to "F off" and fled. *Id.* Yet again, Officer Canas ordered Wallace to stop by shouting, "stop, police," before pursuing him, and ultimately, tasing Wallace. *Id.* at 92. Wallace argues his running away from Officer Canas cannot be deemed fleeing[8] law enforcement because Officer Canas's commands did not amount to a sufficient order to stop. However, for a defendant to be found in violation of Indiana Code Section 35-44.1-3-1, law enforcement need not specifically order a person to "stay at a particular location so that the officer can question the person." *Appellant's Br.* at 11. The officer's clear demand to "stop" left nothing to the imagination and Wallace's argument to the contrary is directly at odds with the language of Indiana Code Section 35-44.1-3-1(a)(3). We have no trouble concluding sufficient evidence supported Wallace's conviction for resisting law enforcement.

---

[8] In the context of the resisting statute, "flight" can mean a "knowing attempt to escape law enforcement when the defendant is aware that a law enforcement officer has ordered him to stop or remain in place once there." *Wellman v. State*, 703 N.E.2d 1061, 1063 (Ind. Ct. App. 1998) (finding sufficient evidence to support a conviction based upon the charge of fleeing where an officer ordered the defendant to remain outside but the defendant walked inside his house and locked the door behind him). However, it is "ultimately for the [fact-finder] to decide whether there's evidence of knowing or intentional fleeing under the statute." *Batchelor v. State*, 119 N.E.3d 550, 563 (Ind. 2019).

## Conclusion

The trial court did not abuse its discretion when it admitted testimony regarding Johnson's show-up identification of Wallace into evidence, nor did doing so violate Wallace's due process rights under the United States Constitution. Furthermore, the State presented sufficient evidence at trial to support his conviction for resisting law enforcement as a Class A misdemeanor.

Affirmed.

May, J., and Tavitas, J., concur.

ATTORNEYS FOR APPELLANT

Talisha R. Griffin
Marion County Public Defender Agency
Indianapolis, Indiana

Steven J. Halbert
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General
Indianapolis, Indiana

Steven J. Hosler
Deputy Attorney General
Indianapolis, Indiana